**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ROBERT J. SMITH,
Plaintiff-Appellant,

v.

No. 95-1956

SYLVIA J. REDDY, Officer;
BALTIMORE COUNTY, MARYLAND, a
body corporate and politic,
Defendants-Appellees.

ROBERT J. SMITH,
Plaintiff-Appellant,

v.

No. 96-1456

SYLVIA J. REDDY, Officer;
BALTIMORE COUNTY, MARYLAND, a
body corporate and politic,
Defendants-Appellees.

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Frederic N. Smalkin, District Judge.
(CA-95-137-S)

No. 95-1956 Argued: March 5, 1996
No. 96-1456 Submitted: May 5, 1996

Decided: November 27, 1996

Before ERVIN and NIEMEYER, Circuit Judges, and
BUTZNER, Senior Circuit Judge.

_____

Affirmed by published opinion. Senior Judge Butzner wrote the opinion, in which Judge Ervin and Judge Niemeyer joined.

_____

**COUNSEL**

**ARGUED:** William Francis Gately, H. Thomas Howell, HOWELL, GATELY, WHITNEY & CARTER, Towson, Maryland, for Appellant. Michael Allan Fry, Assistant County Attorney, BALTIMORE COUNTY OFFICE OF LAW, Towson, Maryland, for Appellees. **ON BRIEF:** Kathleen D. Leslie, HOWELL, GATELY, WHITNEY & CARTER, Towson, Maryland, for Appellant. Virginia H. Barnhart, County Attorney, Gregory E. Gaskins, Assistant County Attorney, BALTIMORE COUNTY OFFICE OF LAW, Towson, Maryland, for Appellees.

_____

**OPINION**

BUTZNER, Senior Circuit Judge:

Robert Smith, suing under 42 U.S.C. § 1983, asserts that Officer Sylvia Reddy of the Baltimore County Police Department violated the Fourth Amendment by arresting him and searching his house without probable cause. Although Reddy procured warrants authorizing these actions, Smith contends that Reddy's affidavits, filed in support of the warrants, contain false statements and omit material facts, making her reliance on the warrants unreasonable. In response, Reddy argues that she is entitled to qualified immunity from civil liability because she acted in an objectively reasonable manner. The district court agreed with Reddy and granted her motion for summary judgment. Smith v. Reddy, 882 F. Supp. 497 (D. Md. 1995). Smith appealed.

While Smith's appeal was pending in this court, he filed a motion in the district court under Rule 60(b)(2) and (3) of the Federal Rules of Civil Procedure to vacate and set aside the summary judgment. Based on allegedly newly discovered evidence, Smith claimed that the affidavits supporting Reddy's motion for summary judgment included misrepresentations. The district court denied the motion, and

2

Smith again appealed. Both parties have briefed the second appeal, and we now consolidate both appeals. We review the district court's grant of summary judgment de novo, Hodge v. Jones, 31 F.3d 157, 163 (4th Cir. 1994), and its denial of the Rule 60(b)(2) and (3) motion for abuse of discretion. National Organization for Women v. Operation Rescue, 47 F.3d 667, 669 (4th Cir. 1995).

After careful review of the record, we find that Reddy's conduct was objectively reasonable and affirm the summary judgment that granted her immunity. However, we reach that conclusion by an analysis that differs somewhat from the district court's. We also affirm the denial of the Rule 60(b) motion because Smith has not shown fraud or misrepresentation by clear and convincing evidence.

I

The historical facts are not in serious dispute. In the early morning of December 17, 1993, the Baltimore County Police Department was notified that someone had fired a gun into the front door of Christopher's Nightclub, causing no injuries. When the first officers arrived, they were directed to Ms. Lisa Young, a 25-year-old who claimed to be the intended victim of the shooting. At least one of the officers knew that Young had a "bad" reputation in the police department. Young was visibly intoxicated, and, initially, she was uncooperative and reluctant to talk with the officers.

Eventually Young told the interviewing officer that she believed Robert Smith was the gunman. She explained that she and Smith, her boyfriend of eight months, had come to the club together in his black Rolls Royce, which he had parked in the fire lane in front of the club. Shortly after entering the club, Smith became jealous when Young kissed a bartender she knew. He grabbed her by the arm and threatened to kill her. The bartender later confirmed that, when Young kissed him, the man with her became angry and led her away by the arm. According to Young, after having a few drinks, Smith repeated his threat to kill her twice more, once if she refused to leave the club and a second time if she refused to get into his car. Although Young did follow Smith to his car, she then told him she did not want to see him again, threw the ring he had given her into the car, and returned to the club. Back inside a few minutes later, she heard gunshots.

3

Because she had seen a gun hidden under the seat of Smith's car on other occasions, she believed he was shooting at her, so she fled to the women's room.

The police on the scene also interviewed Mr. John Bukofsky and Mr. Jonathan Hawes, who were in the parking lot when the shooting occurred. Shortly before the shooting, they saw the club's bouncer refuse to admit a young white male, wearing a red and white ski jacket. A few moments later, they heard six gunshots and saw a gun flashing. After the shots were fired, Hawes saw the same young man running from the area where the shooting had occurred up a hill to the nearby Padonia Road. Neither witness saw the person firing the shots. Hawes gave an officer six .45 caliber shell casings and showed him where they had been found. The club's bouncer reported that, moments before the shooting, he had turned away a young male wearing a faded blue jacket and had confiscated the driver's license presented by the youth. The name Mark Tilton and a Cockeysville address appear on the license.

Later that day, the case was assigned to Officer Reddy. After reading the initial reports and talking with the officers who had been on the scene, Reddy interviewed Young. Young confirmed that she believed Smith was responsible for the shooting, but admitted she had not seen a gun in his car on the previous night. Young directed Reddy to Smith's house. They met Smith and he agreed to talk with Reddy. During the interview, Smith confirmed that he had accompanied Young to the club, he had been displeased with her conduct, he had decided to leave, they had walked to his car, and she had returned to the club. Smith denied threatening Young, trying to force her to leave with him, or keeping a gun in his car. He also denied shooting at the club or even being aware of the shooting. Reddy asked Smith to consent to a chemical test of his hands that would determine whether he had recently fired a gun. Smith agreed. Despite Smith's consent, the test was not conducted. According to Reddy, she later learned that the test would not have been reliable because too much time had passed since the shooting. Smith told Reddy that he owned four guns, two AK-47s, one 30-30 Winchester, and a .32 automatic pistol.

In addition to interviewing Smith, Reddy attempted to contact Mark Tilton. On December 18, Reddy and another officer spoke with

4

Ms. Deborah Tilton, who reported that her three sons, Mark (age 21), Rodney (age 23), and Kirk (age 17), lived with her but were away for the weekend. Asked if any of her sons had lost their wallets recently, Ms. Tilton said Mark had lost his wallet in February, 1993 somewhere in Cockeysville. In response to further questions, she informed the officers that her sons had not been home on the previous evening, but that none of them owned a gun, a red and white ski jacket, or a blue ski jacket. She said Kirk had been at his aunt's house baking cookies at the time of the shooting. Ms. Tilton did not know where her sons were or when they would come home, but promised to call Reddy when they returned. Ms. Tilton never called and Reddy made no further attempts to contact her sons.

Reddy telephoned Smith on December 20 in an attempt to gather additional information. During the conversation, Reddy asked Smith if he knew why the attacker fired the shots through the club's front door rather than the window. Smith replied, "I guess that's where Lisa was standing at." Reddy then asked Smith why he thought the attack was aimed at Lisa. Smith fell silent. He ended the conversation after Reddy indicated that only the attacker would know the identity of the intended victim.

On December 21, Reddy interviewed Mr. Dennis Bazuine, who was at the club on the night of the shooting. Although Bazuine did not see the shooting, he had spoken with a patron who claimed he saw it. On January 6, he introduced Reddy to Mr. Kevin Earle. Earle told Reddy he had been in the club's parking lot at the time of the shooting. He said he saw the gunman, who was wearing a multicolored ski jacket, firing the shots. Earle recognized him as an older gentleman who regularly parked his black Rolls Royce in the fire lane in front of the club. After the man fired the shots, Earle saw him run up a hill and get into a car on Padonia Road. He did not see the black Rolls Royce on the club's parking lot at that time. Reddy asked Earle why he had not reported this information to the police earlier. He explained that he did tell an officer on the scene what he had witnessed. Earle also told Reddy that he did not know Young.

On January 10, 1994, Reddy sought a warrant for the arrest of Robert Smith. Three days later she sought a warrant authorizing a search of Smith's house. Both warrants were issued and executed. Smith was

5

charged with attempted murder, assault, handgun violations, and reckless endangerment. At a pretrial hearing during which Smith challenged the state's evidence, the state court determined that sufficient evidence existed to remand the case for trial. Following a bench trial, Smith was acquitted of all charges.

On January 17, 1995, Smith filed this case in district court. The district court found that Reddy was entitled to qualified immunity and granted her motion for summary judgment. The district court denied Smith's subsequent motion to vacate and set aside the judgment. Smith appealed both rulings.

II

The ultimate issue presented in this appeal is whether the district court properly granted Officer Reddy qualified immunity. Although we conclude that Reddy is entitled to immunity, we reach that conclusion by means of a somewhat different analysis than the district court.

The district court held that if a plaintiff alleges that an officer obtained a warrant by misleading a magistrate, the plaintiff must satisfy the subjective standard set forth in Franks v. Delaware, 438 U.S. 154, 155-56 (1978), to overcome a defendant's claim of qualified immunity. The Franks standard requires "a substantial preliminary showing that a [material] false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." Id.; United States v. Colkley, 899 F.2d 297, 300 (4th Cir. 1990). Rather than engaging the Franks test, we apply the qualified immunity analysis, which examines the objective reasonableness of an officer's conduct. Anderson v. Creighton, 483 U.S. 635, 639 (1987); Harlow v. Fitzgerald, 457 U.S. 800, 815-19 (1982). The objective standard pertaining to qualified immunity accommodates the allegation of falsity because a reasonable officer cannot believe a warrant is supported by probable cause if the magistrate is misled by statements that the officer knows or should know are false. See United States v. Leon, 468 U.S. 897, 922-23 (1984).

Law enforcement officers are entitled to qualified immunity from § 1983 liability arising from their official discretionary acts that do not "violate clearly established statutory or constitutional rights of

6

which a reasonable person would have known." Harlow, 457 U.S. at 818; see also Malley v. Briggs, 475 U.S. 335, 345 (1986). In order to determine whether an officer's conduct is immunized, this court has formulated a three-step analysis: (1) identify the right allegedly violated, (2) decide whether that right was clearly established at the time of the alleged violation, and, if so, (3) determine whether a reasonable person in the officer's position would have known that his or her actions violated that right. Pritchett v. Alford , 973 F.2d 307, 312 (4th Cir. 1992). If the right was not clearly established at the relevant time or if a reasonable officer might not have known his or her conduct violated that right, the officer is entitled to immunity.

In this case, Smith alleges that Reddy violated his constitutional right not to be arrested or searched without probable cause. Although the arrest and search underlying Smith's claim were authorized by warrants, he asserts that Reddy obtained the warrants by including false statements in, and omitting material facts from, the warrant applications. Smith's position is that, based on the facts known or readily available to Reddy, it was unreasonable for her to conclude that the warrants in this case were supported by probable cause. Or, at the least, Smith argues, the record reveals genuine issues of material fact that precluded the district court from entering summary judgment before discovery.

III

Because the Fourth Amendment right to be arrested only on probable cause is clearly established, the question that remains is whether a reasonable person in Reddy's position would have thought her actions violated that right. The reasonableness of Reddy's conduct does not turn on whether probable cause was, in fact, present. Hunter v. Bryant, 112 S. Ct. 534, 536 (1991). When an officer acts pursuant to a warrant, the pertinent question is whether the officer could have reasonably thought there was probable cause to seek the warrant. Anderson, 483 U.S. at 638-39; Torchinsky v. Siwinski, 942 F.2d 257, 261 (4th Cir. 1991). Qualified immunity is lost only if "the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable." Malley, 475 U.S. at 344-45. In other words, an officer is not denied qualified immunity for making

7

a mistake, as long as that mistake is reasonable under the circumstances.

When Reddy sought the warrants, the evidence implicating Smith was substantial. Young's description of the evening's events gave Smith a plausible motive for the shooting, and he had an opportunity to fire the shots. Earle's eyewitness account provided direct evidence that Smith was the gunman. In addition, Earle's report supported and tended to confirm Young's account. Finally, Smith's conduct during his second conversation with Reddy, although not unambiguously incriminating, could certainly be viewed as suspicious. Based on these facts, a state court determined that probable cause existed and issued the warrants.

Smith does not contend that the warrant application did not establish probable cause. Rather, he argues that the warrant application presented an inaccurate and misleading view of the facts. In his view, because Reddy knew or should have known the actual facts, it was unreasonable for her to seek the warrants. According to Smith, Reddy should have doubted the reliability of Earle's statement because he was not mentioned in the police reports, even though he claimed he told the police on scene what he had witnessed. Smith also asserts that any reasonable officer would have questioned Young's credibility in light of her reputation and her intoxication on the night of the shooting. Finally, Smith suggests that Reddy inadequately investigated the youth seen running from the club. When these factors are viewed together, Smith argues, it becomes clear that probable cause was lacking.

We reject Smith's argument. First, although Earle is not mentioned in the police reports, it was not unreasonable for Reddy to rely on his statement. Of course, it would have been better if Reddy had tried to determine why Earle was not mentioned in the reports, but this oversight was not nearly as egregious as Smith portrays it. Although Reddy spoke with Earle for the first time three weeks after the shooting, it is undisputed that Earle entered the club several minutes after the shots were fired. Bazuine, who introduced Reddy to Earle, told Reddy that Earle had described the shooting to him on the night it took place. Both Earle's story and the version of the story retold by Bazuine include several specific facts that reveal Earle's knowledge

8

of the crime scene. As disinterested parties, neither Earle nor Bazuine had any apparent motive for hiding the truth. In addition, Earle's account was consistent with the other evidence implicating Smith. Although the judge in the criminal trial found Earle's testimony to be unreliable, a police officer conducting an investigation is not in a position to make the type of credibility determination that occurs in the repose of the courtroom. See Torchinsky, 942 F.2d at 262-63.

Reddy could also have reasonably believed that Young's reputation and intoxication did not seriously undermine the reliability of her account. Many of the details of her statement were confirmed by disinterested observers and by Smith himself. Also, her account is consistent with Earle's eyewitness account. Although she may not be a model witness, the police must take complaining witnesses as they find them. See Torchinsky, 942 F.2d at 263.

Finally, Reddy's failure to pursue the other suspect did not make it unreasonable for her to seek warrants against Smith. Although an officer may not disregard "readily available exculpatory evidence of which [the officer] had been made aware," an officer's failure to pursue a potentially exculpatory lead is not sufficient to negate probable cause. Torchinsky, 942 F.2d at 264.

Weighing all of the evidence, it is clear that a reasonable police officer in Reddy's position could find probable cause for the arrest and search.

IV

Smith protests that he was denied discovery and that summary judgment is inappropriate. The district court, however, committed no procedural error.

The Supreme Court has directed that "qualified immunity questions should be resolved at the earliest possible stage of a litigation." Anderson, 483 U.S. at 646 n.6. The reason is that qualified immunity is "an immunity from suit rather than a mere defense to liability; . . . it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis in original).

9

"[E]ven such pretrial matters as discovery are to be avoided if possible, as `[i]nquiries of this kind can be peculiarly disruptive of effective government.'" Id. at 526 (quoting Harlow, 457 U.S. at 817). Accordingly, qualified immunity should be addressed at the pleading or summary judgment stage whenever possible. Pritchett, 973 F.2d at 313. Even so, summary judgment should be granted only when it is appropriate, that is, when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Id.

"Subjective factors involving the officer's motives, intent, or propensities are not relevant. The objective nature of the inquiry is specifically intended to limit examination into an officer's subjective state of mind, and thereby enhance the chances of a speedy disposition of the case." Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994). If the material facts and the reasonable inferences drawn from those facts disclose that a reasonable officer could have believed that his or her actions did not violate the clearly established right, the defendant is entitled to qualified immunity on summary judgment. See Pritchett, 973 F.2d at 312-13.

V

The basis for Smith's Rule 60(b) motion is newly discovered evidence which he contends reveals that Reddy and other officers made fraudulent misrepresentations in their summary judgment affidavits. Smith claims he found, through depositions taken in state court proceedings, evidence demonstrating that the police doubted Young's credibility and that Reddy's supervisor did not oversee or approve her investigation. This evidence, Smith argues, directly contradicts statements made in the summary judgment affidavits. Smith also claims that the affiants misrepresented the facts to make Earle's story seem more plausible.

Smith's motion is without merit. To prevail, he would need to prove the alleged misconduct by clear and convincing evidence. Square Construction Co. v. Washington Metropolitan Area Transit Authority, 657 F.2d 68, 71 (4th Cir. 1981). Much of the so-called new evidence cited in Smith's brief appears in the original summary judgment record. More importantly, the few inconsistencies between the

10

deposition testimony and the affidavits do not even approach clear and convincing evidence of misconduct.

VI

We affirm the district court's judgment granting Reddy qualified immunity and its denial of Smith's Rule 60(b)(2) and (3) motion.

No. 95-1956 - <u>AFFIRMED</u>
No. 96-1456 - <u>AFFIRMED</u>

11