**Donald Thomas OSBORNE, Jr., Plaintiff,**

v.

**W.D. ROSE, Defendant.**

**Donald Thomas OSBORNE, Sr., Plaintiff,**

v.

**W.D. ROSE, Defendant.**

**Civil Action Nos. 96–0059–A, 96–0060–A.**

United States District Court,
W.D. Virginia,
Abingdon Division.

Jan. 24, 1997.

*I*

Dennis Eugene Jones, Dennis E. Jones & Associates, Lebanon, VA, for plaintiffs.

W. Mark Dunn, Office of the Attorney General, Richmond, VA, for defendant.

### OPINION AND ORDER

JONES, District Judge.

In these related cases arising under 42 U.S.C. § 1983, the defendant has moved for summary judgment on the ground, among others, of qualified immunity. In general I find the questions can only be resolved by the determination of disputed issues of fact. Since the pretrial record shows genuine issues of fact for trial, I must (with one minor exception) deny the motions for summary judgment.

These cases arise out of a violent confrontation on November 21, 1994 in Russell County, Virginia, between the plaintiffs Donald Thomas Osborne, Sr. ("Osborne, Sr."), his adult son Donald Thomas Osborne, Jr. ("Osborne, Jr."), and the defendant William D. Rose, a state game warden. In the early morning of the opening day of deer-hunting season, Rose, in uniform, was on patrol in an unmarked state car. He observed Osborne, Sr. in hunting clothes, driving slowly along a rural road in an area frequented by deer. Osborne, Jr., also in hunting clothes, was a passenger in the vehicle. Suspecting that the Osbornes might be hunting from the vehicle in violation of state law, Rose followed them down a private road.

At this point the evidence becomes sharply disputed.[1] Rose contends that he saw Osborne, Sr. open the door of the car, sight down a rifle, and then pull the gun back into the car and drive off. He says he followed the Osbornes with the intent of warning them against hunting from a vehicle, even on private property, and turned on his car's siren briefly. At that time, Osborne, Sr. turned his vehicle around and drove directly at Rose, making "obscene gestures" as he passed. Osborne, Sr. drove at Rose a second time, yelling, "I'll hit you, I'll hit you!" as both Osbornes made obscene gestures. The Osbornes then got out of their vehicle and ran towards Rose, cursing and angry.

Rose asserts that at this point Osborne, Sr. reached inside his jacket. In response, Rose drew his service revolver and ordered both men to the ground. Neither complied and Osborne, Sr. ran back to his car, pulled out a rifle and pointed it at Rose. Rose claims that he twice instructed Osborne, Sr. to put down the rifle. When he refused, Rose fired three times. One of the shots grazed Osborne, Sr.

The evidence presented by the plaintiffs is dramatically different. The Osbornes contend they were not hunting, but were searching for lost cattle. They allegedly heard no siren and only became aware that Rose was a

1. In connection with the pending motion for summary judgment, the parties have submitted affidavits and extracts from transcripts of the state criminal trials that arose from the incident. Discovery in these cases has been stayed until resolution of the issue of qualified immunity.

law enforcement officer when he exited his car. According to the Osbornes, Rose then accused them of illegal hunting. Osborne, Sr. denied this:

> I said, "Man, we ain't hunting. How can you expect me to be hunting. I don't even have a gun with me. How do you expect me to be hunting?"
>
> He kept on mumbling. I said, "This is my farm. You are trespassing. Get out of my farm."
>
> He said, "This farm don't belong to you." He said, "I know who it belongs to. You are a trespasser. You are hunting on posted land up in here."
>
> I told him I would go call the sheriff's department and I would resolve that problem. He was wild then. Something the matter with him.

Criminal Trial Transcript ("Tr.") at 175.

Osborne, Sr. claims that as he turned to go back to his vehicle, Rose, approximately twenty feet away, opened fire on him. After three shots, Rose appeared to be working on his gun, and the Osbornes made an escape in their vehicle.

Fortunately, Osborne, Sr. was not seriously injured by the shot which hit him. According to Osborne, Jr., the second shot hit his father. The third shot, he felt, was aimed at him:

> Q Did you see or hear the third shot go off?
>
> A Yes, sir.
>
> Q In what direction did you observe that shot being discharged?
>
> A In my own opinion, my own way.
>
> Q After those shots were fired, did you observe Officer Rose do anything?
>
> A Yes, sir.
>
> Q What did he do?
>
> A Pointed his gun straight at me and tried to get it to fire again.
>
> Q How could you tell he was trying to do that?
>
> A Because he had it pointed straight at me like this, pulling the trigger, but it wouldn't fire (indicating).
>
> Q After that was done, what happened?

> A After that I seen it wouldn't fire and Dad had done got in the car and took a run as it was pulling out, I jumped in and Rose was down, whenever we turned around, he was working on his gun.

Tr. at 300–01.

Shortly after the incident, Rose went before a state magistrate who issued criminal warrants charging Osborne, Sr. with attempted murder, use of a firearm in an attempted murder, attempted abduction, and failure to obey a conservator of the peace. Osborne, Jr. was charged with attempted murder, attempted abduction, and failure to obey a conservator of the peace. The Osbornes were arrested pursuant to these warrants and released on bail. Prior to a hearing, the failure to obey charges were amended to charges of impeding a game warden in the discharge of his duties.

The Osbornes received a preliminary hearing on January 10, 1995. The impeding charges were dismissed without prejudice on the motion of the prosecutor, and the judge found no probable cause for the other, more serious, charges. As permitted by state law, however, the prosecutor submitted the incident to the Russell County grand jury, which returned indictments against Osborne, Sr. for brandishing a firearm and impeding a game warden and against Osborne, Jr. for impeding a game warden. On July 19, 1995, after a trial in the Circuit Court of Russell County, a jury acquitted Osborne, Sr. of the brandishing charge but convicted him of impeding a game warden, resulting in a $1,000 fine. Osborne, Jr. was acquitted.

At the trial, a forensic expert testified for the defendants that the location of the bullet hole in Osborne, Sr.'s clothing indicated that he could not have held a rifle as Rose contended. In addition, a witness to the incident, a family friend of the Osbornes, corroborated their version of certain material events.

On May 7, 1996, the Osbornes filed the present actions seeking damages and contending that Rose used excessive force, committed an assault and battery, effected a false arrest through perjured testimony before the magistrate, and maliciously prose-

cuted them. They have demanded a jury trial.

## II

 Rose has moved for summary judgment with regard to the Osbornes' excessive force claims on the ground of qualified immunity. Public officials are entitled to immunity from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In judging a defense of qualified immunity in an excessive force case, the proper inquiry is "whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances." *Rowland v. Perry,* 41 F.3d 167, 173 (4th Cir.1994).

In this case, "a determination of what actually happened is absolutely necessary to decide whether [the defendant] could reasonably have believed that his actions were lawful." *Rainey v. Conerly,* 973 F.2d 321, 324 (4th Cir.1992). The real question in the case is whose version of events is to be accepted. According to the evidence submitted by the Osbornes, defendant Rose could not have believed his conduct lawful; if Rose is to be believed, he was justified in using deadly force. "If there are genuine issues of historical fact respecting the officer's conduct or its reasonableness under the circumstances, summary judgment is not appropriate, and the issue must be reserved for trial." *Pritchett v. Alford,* 973 F.2d 307, 313 (4th Cir.1992).[2]

With regard to Osborne, Jr., Rose argues that his conduct amounted "to no more than pointing his gun," and that he reasonably could have believed that this action was lawful under the circumstances. In support of this argument, Rose relies on *Taft v. Vines,* 83 F.3d 681 (4th Cir.1996) (en banc) (adopting dissenting opinion in *Taft v. Vines,* 70 F.3d 304, 317 (4th Cir.1995) (Motz, J., dissenting)). In *Taft,* during the course of a vehicular search, based on valid probable cause, police officers kept their weapons aimed at a car as its occupants exited. *Taft,* 70 F.3d at 317.

Unlike the facts in *Taft,* however, Rose is accused of actually shooting at Osborne, Jr., missing him and attempting to shoot him again, foiled only by a malfunction of his revolver. In *Taft,* the court carefully distinguished merely drawing pistols during the course of a valid search from the more extreme case of officers holding guns "to the heads" of arrestees. *Id.* at 320.

If the Osbornes are right, Rose had no justification for firing his gun—he was not in danger himself and was entirely the aggressor. It was Rose, according to the Osbornes, who became "wild" and escalated a merely unpleasant encounter into a near-tragedy. Under this view, Rose's force was truly disproportionate and egregious, even if, by the barest of margins and happenstance, he did not kill or seriously injure both men. Of course, the trier of fact may disbelieve this version of the events. But until it does, I cannot hold that Rose has immunity simply because he was a poor shot.

## III

 Rose also argues that he is entitled to immunity as to the constitutional malicious prosecution claim. Here he takes a different tack, asserting that the constitutional right at issue is not clearly established, and was not at the time of the events, so that Rose cannot be charged with knowing that he would violate such a right.

 Qualified immunity requires a three-pronged analysis: (1) an identification of the right violated; (2) whether the right in ques-

---

**2.** Rose argues that Osborne, Sr.'s testimony supports Rose's use of deadly force. Osborne, Sr. testified that he had his thumbs hooked under his coat in his overalls immediately before Rose began firing. Rose contends that this testimony supports his claim that Osborne, Sr. reached into his coat in a movement that appeared threatening. However, Rose testified that this movement occurred before he shot, and was the action that caused him initially to pull his service revolver. Rose claims that he fired later, after Osborne, Sr. went back to the car, retrieved a rifle, and pointed it at Rose. In any event, the correct interpretation of Osborne, Sr.'s hand movement is another matter to be decided at trial.

tion was established so clearly as to alert a reasonable officer of its constitutional significance; and (3) whether a reasonable officer would have known that his conduct was lawful. *Torcasio v. Murray,* 57 F.3d 1340, 1343 (4th Cir.1995).

Rose bases his argument on *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). In *Albright,* a plurality of the Supreme Court held that the right to be free from prosecution without probable cause must be analyzed under the Fourth Amendment instead of on the basis of substantive due process. *Id.* at 271, 114 S.Ct. at 811–12.[3] The Chief Justice's plurality opinion, quoting the Seventh Circuit, noted that "the extent to which a claim of malicious prosecution is actionable under § 1983 is one 'on which there is an embarrassing diversity of judicial opinion.'" *Id.* at 270 n. 4, 114 S.Ct. at 811 n. 4 (quoting *Albright v. Oliver,* 975 F.2d 343, 345 (7th Cir.1992)). Accordingly, Rose contends that at the time of the incident in this case, "the constitutional bases [sic] for this constitutional tort—if it were a constitutional tort at all—was unclear." Def.'s Mem.Supp.Summ.J. at 13.

While it is true that the constitutional source of a section 1983 malicious prosecution claim was at issue in *Albright,* a majority of the members of the Court did not question the principle that freedom from baseless criminal prosecution is constitutionally protected.[4] As the plurality opinion pointed out, "[m]ost of the lower courts recognize some form of malicious prosecution action under § 1983." *Albright,* 510 U.S. at 270 n. 4, 114 S.Ct. at 811 n. 4.

The Fourth Circuit has recognized such a constitutional right, both before *Albright,* in *Goodwin v. Metts,* 885 F.2d 157, 164 (4th Cir.1989), and after *Albright,* in *Brooks v. City of Winston–Salem,* 85 F.3d 178, 183–84 (4th Cir.1996). Regardless of the precise legal theory applicable, the "contours of the right [were] sufficiently clear that a reasonable official would understand that what he is

doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

If the Osbornes' evidence is believed, defendant Rose had no probable cause to initiate the serious charges against them. A reasonable officer in Rose's situation, under that version of the facts, would have known that the initiation of the charges would violate the plaintiffs' right to be free from such a baseless prosecution.

### IV

■ Along with his qualified immunity defense, Rose asserts that the Osbornes have not suffered injuries of a constitutional magnitude. Although conceding that Osborne, Sr. was shot, Rose argues, on the basis of medical records, that Osborne, Sr. suffered only minor abrasions and, as a result, his excessive force claim should be dismissed.

Although the nature of Osborne, Sr.'s injury is relevant to whether a Fourth Amendment violation occurred, the fact that his injuries consisted only of abrasions is not determinative of that issue. The extent of a plaintiff's injuries must be examined in light of the circumstances of the case to determine if, on the whole, the use of force was reasonable. *See Wardlaw v. Pickett,* 1 F.3d 1297, 1304 n. 7 (D.C.Cir.1993). Under certain facts, the existence of mere abrasions might indicate that a particular use of force was constitutional. In this instance, however, the relevant facts are in dispute and the resolution of this issue must await trial.

■ Rose raises a similar argument with regard to Osborne, Jr.'s excessive force claim, asserting that merely pointing a gun at someone does not rise to the level of a constitutional injury. In support of this argument, Rose relies on *Hinojosa v. City of Terrell,* 834 F.2d 1223 (5th Cir.1988).

*Hinojosa,* an excessive force case, involved a confrontation between the plaintiff and a police officer that resulted in the officer

---

**3.** The Osbornes were arrested following Rose's initiation of the prosecution, and thus were seized within the meaning of the Fourth Amendment. The Osbornes have specifically pleaded a violation of the Fourth Amendment.

**4.** *See* John T. Ryan, Jr., *Malicious Prosecution Claims under Section 1983: Do Citizens Have Federal Recourse?,* 64 Geo.Wash.L.Rev. 776, 801 (1996).

pointing a gun at the plaintiff. *Hinojosa*, 834 F.2d at 1225. The officer did not physically touch the plaintiff nor did his actions result in any physical injury to the plaintiff. *Id.* at 1229-30. Under the particular facts, the court held that the pointing of a gun did not amount to a constitutional injury actionable under § 1983. *Id.* at 1230-31.

The court, however, distinguished the facts before it, characterized as "a display of force coupled with the conditional threat to actually use force," from a situation involving "the present use or attempted use of force." *Id.* at 1231 n. 10. In particular, the *Hinojosa* court noted that the officer's revolver had its safety on and was never fired. *Id.*

The factual scenario posited by the Osbornes presents a situation similar to that which the *Hinojosa* court distinguished as an injury of potentially constitutional significance. Under the Osbornes' facts, Rose's actions constituted, not a mere display of force, but an actual use of force against both men. As these disputed facts could substantiate a constitutional injury, I must also reserve this issue for trial.[5]

## V

Rose contends that the plaintiffs' claim of false arrest is insupportable, because the Osbornes were arrested on the basis of warrants issued by a state magistrate. Generally, a police officer who in good faith obtains a warrant from a magistrate and acts within its scope cannot be liable for false arrest. *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir.1991). A magistrate's probable cause determination normally shields an officer from liability for an arrest which is

subsequently determined to be without probable cause. *Amato v. City of Richmond*, 875 F.Supp. 1124, 1144 (E.D.Va.1994).

This shield, however, does not necessarily extend to an officer who also provides the information on which a magistrate's probable cause determination is based. *Olson v. Tyler*, 771 F.2d 277, 280-81 (7th Cir. 1985). An officer who, in support of a warrant application, submits an affidavit with a reckless disregard for the truth or with statements known to be false, may be held liable for a resulting false arrest despite the issuance of a facially valid warrant.[6] The false or misleading statements must be "necessary to the finding of probable cause." *Wilkes v. Young*, 28 F.3d 1362, 1365 (4th Cir.1994) (quoting *Franks v. Delaware*, 438 U.S. 154, 156, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978)).[7]

Again, the disputed facts at issue in this case prevent me from deciding this issue on summary judgment. Under the Osbornes' facts, Rose would not receive the protection afforded officers who rely on arrest warrants obtained from a magistrate. If the Osbornes' version of the events is accepted, Rose's affidavit in support of the warrant contains clearly false statements that were essential to the magistrate's probable cause determination. Accordingly, I am not permitted to resolve these fact-dependent issues.

## VI

Finally, Rose argues that Osborne, Jr.'s causes of action for assault and battery, which are pendant state claims, should be dismissed. He contends that since Osborne, Jr. was not hit by gunfire, he has no claim

---

5. *See McDonald v. Haskins*, 966 F.2d 292, 294 (7th Cir.1992) (recognizing excessive force claim based on threatening plaintiff at gunpoint); *Martin v. Board of County Comm'rs*, 909 F.2d 402, 407 (10th Cir.1990) ("It would require a perverse reading ... to conclude that officers can employ whatever threat or nonphysical force they want, regardless of the amount of injury inflicted, so long as no physical contact exists.").

6. *Amato*, 875 F.Supp. at 1144 (citing *Olson*, 771 F.2d at 281). To the extent that Rose is raising a qualified immunity defense with regard to the Osbornes' false arrest claims, my analysis is guided by the Fourth Circuit's recent opinion in *Smith v. Reddy*, 101 F.3d 351 (4th Cir.1996). In

*Smith*, the Fourth Circuit stated that a reasonable officer, who knowingly provides false statements to a magistrate issuing an arrest warrant, cannot believe probable cause exists and is not entitled to qualified immunity. *Id.* at 355. Under the Osbornes' facts, Rose deliberately misled the magistrate.

7. If probable cause is still established after the excision from the warrant affidavit of any alleged misstatements, no false arrest claim can be maintained. *See Wilkes*, 28 F.3d at 1365. In this instance, without the false statements allegedly made by Rose, no probable cause existed.

for battery, and that his assault claim is barred by the state statute of limitations.

Rose correctly asserts that in order to sustain a battery claim Osborne, Jr. must demonstrate that he was actually touched. *See Crosswhite v. Barnes,* 139 Va. 471, 124 S.E. 242, 244 (1924); 2A *Michie's Jurisprudence of Virginia and West Virginia, Assault and Battery* § 3 (1992). In this instance, no evidence exists that such contact occurred, and on this basis, Osborne, Jr.'s battery claim must be dismissed.

■ Rose also asserts that Osborne, Jr.'s assault claim is barred by Virginia's one-year catchall limitations period. Va.Code Ann. § 8.01–248 (Michie 1992)[8] Rose argues that because no physical injuries resulted from his conduct towards Osborne, Jr., the assault is not governed by the two-year statute of limitations applied to personal injury claims. Va.Code Ann. § 8.01–243.A (Michie 1992). The lack of a physical injury to Osborne, Jr., however, is not determinative of whether the two-year personal injury limitations period should apply to his assault claim. The Virginia Supreme Court has broadly interpreted the term "injury" for the purposes of the personal injury limitations period and has indicated that it encompasses both physical and mental injuries. *See Purcell v. Tidewater Construction Corp.,* 250 Va. 93, 458 S.E.2d 291 (1995); *Glascock v. Laserna,* 247 Va. 108, 439 S.E.2d 380 (1994). Osborne, Jr. alleges that he suffered pain and mental anguish from the assault. Compl. ¶ 30. Accordingly, I find that Osborne, Jr.'s common-law assault claim is governed by the two-year limitations period and deny Rose's motion for summary judgment in this respect.

## VII

For the reasons set forth above, it is **ORDERED** as follows:

1. The common law battery claim by Donald Thomas Osborne, Jr. is dismissed.

2. The motions for summary judgment are otherwise denied;

3. These cases are consolidated for trial; and

4. The stay of discovery previously entered is rescinded.

---

8. Actions accruing after July 1, 1995 for which no limitations period is otherwise specified are now subject to a two-year limitations period. Va.Code Ann. § 8.01–248 (Michie Supp.1996).