**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 09-1737**

ANGELA SWAGLER; ELIZABETH WALSH,

        Plaintiffs - Appellees,

      v.

NEIGHOFF, State Trooper, in his official and in his
individual capacity; BRADLEY, State Trooper, in his official
and in his individual capacity; RASINSKI, in his official
and in his individual capacity,

        Defendants - Appellants,

      and

HARFORD COUNTY; CITY OF BEL AIR, MARYLAND; TERRENCE
SHERIDAN, Colonel, in his official capacity; DONALD RAVADGE,
Bel Air Police Officer in his individual capacity; MARK
ZULAUF, Bel Air Police Officer in his official capacity;
ARMAND DUPRE, Bel Air Police Officer in his individual
capacity; L. JESSE BANE, Harford County Sheriff, in his
individual capacity,

        Defendants.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.  Richard D. Bennett, District Judge.
(1:08-cv-02289-RDB)

Argued:  March 24, 2010        Decided:  October 18, 2010

Before MICHAEL and DAVIS, Circuit Judges, and Eugene E. SILER,
Jr., Senior Circuit Judge of the United States Court of Appeals
for the Sixth Circuit, sitting by designation.

———————

Affirmed in part and reversed in part by unpublished per curiam opinion.

———————

**ARGUED:** Joshua Neal Auerbach, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellants. Timothy Donald Chandler, ALLIANCE DEFENSE FUND, Folsom, California, for Appellees. **ON BRIEF:** Douglas F. Gansler, Attorney General, Baltimore, Maryland, for Appellants. Kevin Theriot, Dale Schowengerdt, ALLIANCE DEFENSE FUND, Leawood, Kansas, for Appellees.

———————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Maryland law enforcement officers arrested Appellees Angela Swagler and Elizabeth Walsh, together with 16 others, as they participated in a pro-life demonstration taking place along a state highway in Harford County, Maryland. The Appellants, Maryland State Troopers Christopher Bradley, Charles Neighoff, and Walter Rasinski ("Appellants" or "the troopers"), having dispersed the demonstrators one hour earlier at a nearby location, and having consulted with a local prosecutor, effected Appellees' arrests and charged them with impeding traffic (among other violations). Seeking damages as well as injunctive and declaratory relief under federal and state law, Swagler and Walsh filed a nine-count amended complaint against the troopers and numerous other defendants. The troopers moved to dismiss, or, in the alternative, for summary judgment, as to all federal claims asserted against them in their individual capacities, invoking qualified immunity. The district court concluded that the request for qualified immunity was "premature" and denied the troopers' motion. In so ruling, the district court explicitly declined to treat the troopers' motion as a motion for summary judgment. The troopers now bring this interlocutory appeal from the district court's denial of qualified immunity.

We conclude that the district court committed no abuse of discretion in declining to consider the troopers' motion as a

3

motion for summary judgment and, instead, in limiting its consideration of the request for qualified immunity to the amended complaint filed by Appellees and the attachments thereto. Nevertheless, we further conclude that two of Appellees' claims fail as a matter of law. Accordingly, we affirm in part and reverse in part. (Appellees' motion to file attachments to their brief is denied as moot.)

I.

The following facts are undisputed or are drawn from the well-pled allegations contained in Appellees' amended complaint and set forth in the light most favorable to Appellees, the non-movants in the district court.

At approximately 4:00 p.m. on Friday, August 1, 2008, Swagler and Walsh, then 18 and 20 years old, respectively, gathered with 20 to 30 other members of a pro-life/anti-abortion group (all wearing blue T-shirts with large white lettering conveying their fundamental message: "Pro-Life" on the front; "Defend Life" on the back). The group staged a demonstration ("the first demonstration") at the intersection of state Route 24 (an 11-lane divided highway) and Route 924 in Harford County, Maryland. There are no sidewalks in or at this intersection and one of the troopers who regularly patrols in the vicinity attested that he had never observed pedestrians in the area. A

4

grassy shoulder runs adjacent to Route 24 and there is a grassy median separating the northbound and southbound lanes. The intersection of Routes 24 and 924 is approximately one-half mile north of the heavily-used Route 24 interchange with I-95.

The demonstrators held posters, some of which were as large as three feet by five feet and included graphic images of dismembered fetuses.[1] The demonstrators stood 20 to 40 feet apart, taking care, they alleged, not to disrupt passing motorists' views of road signs.

By 4:20 p.m. that day, motorists driving through the intersection and on Route 24 began to call the Maryland State Police Barrack in Bel Air, Maryland. Specifically, between 4:20 p.m. and 4:40 p.m., the Barrack received approximately 20 calls from motorists traveling through the area; eight of the calls were recorded. (The rapid receipt of the calls apparently overwhelmed the Barrack's recording capacity.) The content of the recorded calls reflect that the callers expressed two sentiments: (1) disapproval of the public display of images of dismembered fetuses and (2) concern about the impact of the

---

[1] The demonstrators displayed large, full-color images of the dismembered fetus known in the Pro-Life/Anti-Abortion Movement as "Baby Malachi," an image that has long been a staple of such demonstrations. See World Wide Street Preachers' Fellowship v. City of Owensboro, 342 F. Supp. 2d 634, 636 (W.D.Ky. 2004); New York ex rel. Spitzer v. Cain, 418 F. Supp. 2d 457, 462 n.2 (S.D.N.Y. 2006).

images on their own ability and that of others to drive safely. At the time of the police response to the calls about the demonstration, Friday evening rush hour was underway. The posted speed limit on this portion of Route 24 is 55 miles per hour.

Upon her receipt of the motorists' calls (and after learning of others received by subordinates), the duty sergeant at the Barrack dispatched Troopers Bradley, Neighoff, and Rasinski to the scene. Trooper Bradley was the first to arrive, followed by Rasinski and Neighoff. The troopers observed about 30 persons standing on and about the shoulders of the intersection and on the median strip of Route 24 holding the posters. The troopers informed the participants, incorrectly, that county law required that they obtain a "permit" to conduct the demonstration. When they learned the demonstrators had no "permit," the troopers ordered the group to "leave the area" and to "leave the county," specifically informing the demonstrators that they would be arrested unless they discontinued their demonstration.[2] After expressing disagreement with the troopers

_____

[2] Although the "leave the county" order was urged on us at oral argument, in neither their amended complaint nor in their affidavits did Appellees make that particular allegation. Rather, the amended complaint alleges that Appellees were told, "You need to pack up and go or you're going to jail, that's it." J.A. 50. In any event, Appellees knew they remained in Harford County when they relocated within the town limits of Bel Air, two miles north of their original location. They simply miscalculated the jurisdictional reach of the state police. J.A. (Continued)

6

over several minutes of dialogue with them, during which they insisted that they had a First Amendment right to be where they were, doing what they were doing, the demonstrators departed the area.[3] In particular, Appellees told the troopers that because the demonstrators wished to avoid arrest, they would comply with the dispersal order. J.A. 49 (Am. Compl. ¶ 37).

Meanwhile, Trooper Charles Mohr (who is not a party to this appeal) telephoned the Office of the State's Attorney for Harford County to seek a prosecutor's advice regarding the proper response to the demonstration. Trooper Mohr spoke with Deputy State's Attorney Scott Lewis, who opined, albeit somewhat tentatively, that the demonstrators were likely violating the county law that prohibits the obstruction of the free flow of traffic and that the troopers would be "on good ground" to order the demonstrators to leave the area. Lewis specifically noted that the demonstration could cause hazards on the highway during rush hour (arising from, among other things, distracted

---

79 ("We attempted to comply with the . . . troopers' command by moving down the street two miles.").

[3] Appellees contend that they and their group had conducted similar demonstrations within the State of Maryland in the weeks preceding the Harford County demonstration and they had never been ordered to cease their activity.

7

motorists). Trooper Mohr related the substance of this conversation by radio to Trooper Neighoff.

After their confrontation with the troopers at the intersection of Routes 24 and 924, the demonstrators (including Appellees) departed that area and resumed their demonstration approximately two miles north, near or at the intersection of Route 24 and Macphail Road ("the second demonstration"). That location is just inside the Bel Air town limits but still within Harford County. Appellees thought that they had left the enforcement jurisdiction of the state police, but in fact, they had not done so. They resumed their demonstration on the wide grassy shoulder adjacent to Route 24; as at the prior location, there were no sidewalks. At least ten motorists who observed the second demonstration called the Bel Air Barrack to express similar concerns about the nature of the posters and the impact of the demonstrators' presence on traffic safety. Only one of these calls was recorded.

The same three troopers went to the scene of the second demonstration, together with Trooper Mohr. There, Trooper Mohr described to Trooper Neighoff his earlier telephone call with Deputy State's Attorney Lewis and Lewis's advice. Sergeant Donna Bohlen, the troopers' superior officer (who was aware of Lewis's conversation with Mohr), directed the troopers via radio to arrest the demonstrators. The troopers and other law enforcement

8

officers assisting them then arrested 18 of the demonstrators (i.e., those whom the troopers recognized from their earlier encounter at the intersection of Routes 24 and 924), including Appellees, and transported them to the Barrack for processing and charging.

At the Barrack, Trooper Mohr called Deputy State's Attorney Lewis again. Lewis advised Trooper Mohr that the demonstrators should be charged with the following offenses: (1) disorderly conduct, see Md. Code Ann., Crim. Law § 10-201(c)(2); (2) disobeying a lawful order, see id. § 10-201(c)(3); and (3) impeding traffic, see Harford County Code § 193-4(B)(1).[4] With Lewis's recommendation and at the order of Sgt. Bohlen, the troopers charged all of the adult demonstrators with the offenses that Lewis had identified. The Harford County State's Attorney entered a nolle prosequi of all the charges as to all arrestees when the cases came on for trial several weeks after the arrests.

II.

As relevant to this appeal, Swagler and Walsh sought damages pursuant to 42 U.S.C. § 1983 against each of the

---

[4] While one section of Harford County Code § 193-4 prohibits "loitering," the troopers did not charge any of the arrestees with "loitering" -- only with impeding traffic.

9

troopers in his individual capacity on the following four theories: (1) violation of the Fourteenth Amendment due process guarantee based on "vague" "policies and actions;" (2) violation of the Fourteenth Amendment's substantive due process component; (3) violation of the First Amendment free speech guarantee; and (4) violation of the Fourth Amendment's prohibition on unreasonable seizures. The troopers filed pre-discovery dispositive motions based on qualified immunity, providing materials outside of the pleadings in support of the motion. The district court declined to determine whether the troopers were entitled to qualified immunity, concluding that the request was "premature." That is, particularly in light of a Fed. R. Civ. P. 56(f) affidavit from Appellees' counsel seeking permission to take discovery before filing a more substantive response to the troopers' dispositive motion, the district court concluded that Appellees should be given an opportunity for discovery before addressing the issue of qualified immunity.

Specifically, the district court ruled as follows. As to the due process claims, the district court concluded that the Amended Complaint sufficiently alleged violations of constitutional rights, without specific mention of the issue of qualified immunity. Swagler v. Harford County, No. 08-2289, 2009 U.S. Dist. LEXIS 47895, at *18-19 (D. Md. June 2, 2009). As to the First Amendment claims, the court was persuaded that such a

10

claim was "highly fact-dependent." By this, we take it that the court focused on the issue, pressed by Appellees before us, whether proof of the actual subjective motivation of the troopers in ordering the cessation of the demonstration (or in arresting the Appellees upon their defiance of that order) required factual development of the record to inform the qualified immunity inquiry. Id. As to the Fourth Amendment unreasonable seizure claims, the district court essentially concluded that the Appellees had satisfactorily alleged and/or had satisfactorily generated a genuine dispute of material fact as to whether the second demonstration (and perhaps the first as well) had impeded traffic. Id. at *23.

## III.

In this timely interlocutory appeal, over which we have jurisdiction pursuant to 28 U. S. C. § 1291, we review solely legal issues, see Mitchell v. Forsyth, 472 U.S. 511, 529 n.9 (1985); Johnson v. Jones, 515 U.S. 304, 313 (1995), applying a de novo standard.[5] See, e.g., Johnson v. Caudhill, 475 F.3d 645,

---

[5] We reject Appellees' contention that we lack jurisdiction over this appeal under the line of authorities recently summarized in Culosi v. Bullock, 596 F.3d 195, 201-03 (4th Cir. 2010) (dismissing interlocutory appeal by county police officer seeking reversal of district court's denial of qualified immunity at summary judge stage).

11

650 (4th Cir. 2007). Whether an asserted factual dispute is material to qualified immunity is also a legal determination subject to <u>de novo</u> review. <u>See, e.g.</u>, <u>Elliott v. Leavitt</u>, 99 F.3d 640, 644 (4th Cir. 1996).

When evaluating a claim of qualified immunity, courts traditionally engage in a two-step analysis, <u>Wilson v. Layne</u>, 526 U.S. 603, 609 (1999), considering first the threshold question of whether the facts alleged, taken in the light most favorable to the plaintiff, show that the defendants' conduct violated a constitutional right. <u>Saucier v. Katz</u>, 533 U.S. 194, 200-201 (2001). If so, the next step is to determine whether the right was clearly established. <u>Id.</u> In undertaking this case-by-case determination, courts ask "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Id.</u> Importantly,

> [i]n determining whether the right violated was clearly established, we define the right in light of the specific context of the case, not as a broad general proposition . . . . If the right was not clearly established in the specific context of the case -- that is, if it was not clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted -- then the law affords immunity from suit.

<u>McKinney v. Richland County Sheriff's Dep't</u>, 431 F.3d 415, 417-18 (4th Cir. 2005) (internal quotation marks and citations omitted; bracket added). This inquiry is an objective one; "[s]ubjective factors involving the officer's motives, intent,

12

or propensities are not relevant." Smith v. Reddy, 101 F.3d 351, 357 (4th Cir. 1996).

The Supreme Court has modified the strict two-tiered approach. Courts are now authorized to evaluate the two factors in the order most appropriate for the specific case. Pearson v. Callahan, 129 S. Ct. 808, 818 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

IV.

The troopers contend that the district court erred in declining to rule, even at this early stage of the case, that qualified immunity shielded them from Appellees' damages claims.[6]

Specifically, they contend that as to the due process and Fourth Amendment claims, as a matter of law, no constitutional

---

[6] As the district court acknowledged, the Supreme Court "repeatedly ha[s] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam) (alteration added). See Pritchett v. Alford, 973 F.2d 307, 313 (4th Cir. 1992) ("Because qualified immunity is designed to shield officers not only from liability but from the burdens of litigation, its establishment at the pleading or summary judgment stage has been specifically encouraged.").

13

violation can be shown under any plausible interpretation of the facts, and therefore they are entitled to qualified immunity. As to the First and Fourth Amendment claims, they further contend that at the time they acted to disperse the demonstration and then to arrest Appellees for violating the dispersal order, there was no "clearly established" principle of federal constitutional jurisprudence that prohibited local law enforcement officers from doing so.

Appellees forcefully dispute the troopers' contentions. They focus most heavily on their First Amendment claims and emphasize the alleged statement by Trooper Bradley that they "leave the county." They contend:

> Even if [Appellees'] constitutionally-protected speech in a public forum had caused some degree of traffic disruption, that could not have formed a basis to declare the entire county off-limits for free speech activities. This is particularly true given the dubious base upon which the Troopers solely rely to show they were reasonable in arresting Plaintiffs for obstructing traffic: anonymous phone calls from passing motorists who disliked Plaintiffs' message and whose only allegations of disruption were based on Plaintiffs' message, not conduct. In short, the linchpin of the Troopers' qualified immunity claim is their unconstitutional and unreasonable order to leave the county; once this fact is pulled out, their qualified immunity defense falls apart.

Appellees' Br. at 7.

Having fully considered the arguments of the parties and the controlling legal principles, we are constrained to agree with Appellants as to the due process claims. As to the First

14

and Fourth Amendment claims, however, we hold that the district court acted within its discretion in denying the troopers' request for qualified immunity in advance of discovery.

## V.

We first consider whether qualified immunity shields the troopers from Appellees' due process claims. We then consider whether Appellees' First Amendment and their Fourth Amendment claims, respectively, must likewise yield to the troopers' assertion of qualified immunity.

## A.

Unsurprisingly, perhaps, in their briefing and arguments, the parties have essentially ignored the Fourteenth Amendment due process claims.[7] Nonetheless, we conclude that the district court should have dismissed those claims.

It is well-settled that "[l]egislation may run afoul of the Due Process Clause because it fails to give adequate guidance to those who would be law-abiding, to advise defendants of the nature of the offense with which they are charged, or to guide courts in trying those who are accused." Musser v. Utah, 333

---

[7] To be sure, the troopers' Notice of Appeal makes clear that they appeal the denial of qualified immunity on the due process claims as well as the First and Fourth Amendment claims. J.A. 252.

15

U.S. 95, 97 (1948). Here, Appellees alleged that the troopers' "policies and actions against [their] speech are unconstitutionally vague, in that they neither define sufficiently the standards utilized in governing citizens' speech in public fora, nor do they protect against arbitrary and discriminatory enforcement." J.A. 62 (Am. Compl. ¶ 134). These claims fail as a matter of law. First, the void-for-vagueness doctrine focuses on legislation -- not "policies and actions." Second, the Appellees do not point to a specific Maryland State Police policy or a specific action on the part of the troopers that would be considered "vague."

In any event, the troopers' Fed. R. Civ. P. 12(b)(6) motion to dismiss clearly invoked the qualified immunity doctrine vis-à-vis Appellees' due process vagueness claim because, if there is no claim, then there is no constitutional violation based on "clearly established" law. Chavez v. Martinez, 538 U.S. 760, 766 (2003) (Thomas, J.) ("In deciding whether an officer is entitled to qualified immunity, we must first determine whether the officer's alleged conduct violated a constitutional right . . . . If not, the officer is entitled to qualified immunity.") (internal citations omitted); see Siegert v. Gilley, 500 U.S. 226, 232 (1991) (noting that "the determination of whether the plaintiff has asserted a violation of a constitutional right at all" is a "necessary concomitant" to the threshold immunity

16

question). We hold that Appellees have not asserted and cannot assert a cognizable due process "vagueness" claim against the troopers and, therefore, qualified immunity applies to shield the troopers from damages claims asserted on such a theory. Id.[8]

Similarly, Appellees' alleged substantive due process claims are non-existent as a matter of law. The Supreme Court explained in Conn v. Gabbert, "We have held that where another provision of the Constitution 'provides an explicit textual source of constitutional protection,' a court must assess a plaintiff's claims under that explicit provision and 'not the more generalized notion of "substantive due process.'" 526 U.S. 286, 293 (1999) (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)). In the case at bar, the Appellees' rights to free speech and to freedom from unreasonable seizure are explicitly, textually guaranteed under the First and Fourth Amendments, respectively, as incorporated by the Fourteenth Amendment. Accordingly, if Appellees have viable damages claims at all,

_____

[8] Indeed, the due process vagueness claims are clearly moot because, on December 1, 2009, during the pendency of this interlocutory appeal, Appellees filed a second amended complaint in the district court in which they voluntarily dismissed the due process vagueness claims against the troopers. See Colonial Penn Ins. Co. v. Coil, 887 F.2d 1236, 1239-40 (4th Cir. 1989) (observing that this court will take judicial notice of the existence and content of the records of a court of record). They assert the vagueness claim against certain municipal defendants and supervisory officers only. See No. 08-2289, Docket No. 125 at ¶ 137 (D. Md. 12/1/09).

17

they must be rooted in those provisions and not in substantive due process. Conn, 526 U.S. at 293.

B.

The district court essentially declined to consider, under Fed. R. Civ. P. 12(b)(6), the applicability of qualified immunity as to Appellees' First Amendment claims. Although the district court said very little about the First Amendment claims, it basically concluded that whether the First Amendment claims were based on a retaliation theory (as Appellees seem to characterize them on appeal before us), see, e.g., Constantine v. Rectors and Visitors of George Mason Univ., 411 F.3d 474, 499-500 (4th Cir. 2005), or on a theory of improper prior restraint, see Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989), if the allegations in the amended complaint were true, then such a claim would be made out.

We do not disturb the district court's conclusion in that regard. And this is so even though Appellees do not contend that the troopers were actually individually, subjectively motivated to squelch their speech based on its content.[9] Viewed in the

---

[9] Any doubt concerning the gravamen of Appellees' theory is extinguished by an examination of the second amended complaint filed in the district court during the pendency of this appeal. Appellees had originally alleged that "the individual arresting officers acted maliciously and with intent to violate the constitutional and statutory rights of the Plaintiffs by arresting [them]." J.A. 61 (emphasis and alteration added). In (Continued)

18

light most favorable to Appellees, their contention seems to be that the troopers are liable because they took adverse action against Appellees (that is, they ordered the demonstration to cease and then arrested Appellees) by acting as willing agents of the motorists who called the Bel Air Barrack to complain, according to Appellees, about the "content" of Appellees' posters of dismembered fetuses. Under this iteration of Appellees' theory, the troopers culpably enforced a "heckler's veto."[10] Thus, according to Appellees, the dispersal order ("leave the county") was not "content-neutral," was not "narrowly tailored" to serve significant or compelling governmental interests, and did not leave open other channels of communication. See Rock Against Racism, 491 U.S. at 791.

---

the second amended complaint, however, see supra n.8, Appellees have specifically deleted in that allegation the phrase "the individual arresting officers" and instead, have limited that allegation to two supervisory officials. See No. 08-2289, Docket No. 125 at ¶ 123 (D.Md. 12/1/09).

[10] See Brown v. Louisiana, 383 U.S. 131, 133 n.1 (1966); Berger v. Battaglia, 779 F.2d 992, 1001 (4th Cir. 1985) ("Historically, one of the most persistent and insidious threats to first amendment rights has been that posed by the 'heckler's veto,' imposed by the successful importuning of government to curtail 'offensive' speech at peril of suffering disruptions of public order . . . . Though this 'veto' has probably been most frequently exercised through legislation responsive to majority sensibilities, the same assault on first amendment values of course occurs when, as here, it is exercised by executive action responsive to the sensibilities of a minority.") (citations omitted), cert. denied, 476 U.S. 1159 (1986).

19

Furthermore, Appellees contend, their arrests constituted retaliation based on the content of their speech. They specifically allege they are "chilled" from further pro-life demonstrations in Harford County as a result of the troopers' actions and that they suffer from several adverse emotional and psychological effects from their arrests. J.A. 62.

Whether Appellees will be able to sustain their damages claims against the troopers and overcome the assertion of qualified immunity, either at the summary judgment stage or later on the basis of jury factfinding if summary judgment is denied, we need not and do offer an opinion in this interlocutory appeal. Manifestly, the "pure speech" quality of images of a dismembered fetus (at least as the image is deployed in the pro-life movement, see supra n.1) counsels our respect for Appellees' claims. See Am. Legion Post 7 v. City of Durham, 239 F.3d 601, 606 (4th Cir. 2001) ("'[c]ommunication by signs and posters is virtually pure speech'") (citation omitted).

On the other hand, however, in ordering the cessation of the first demonstration, the troopers arguably acted reasonably and on a content-neutral basis to address a risk of automobile accidents. Cf. Lytle v. Doyle, 326 F.3d 463, 470 (4th Cir. 2003) (observing that "the State may act to protect its substantial and legitimate interest in traffic safety" consonant with First Amendment protections) (citations omitted); Ovadal v. City of

20

Madison, 469 F.3d 625, 630 (7th Cir. 2006) (observing that removal of a protester carrying large signs on busy highway overpass deemed content-based if his "<u>message</u> angered drivers who then reacted and were distracted from the task of driving safely[,]" but content-neutral if his "<u>presence</u> on that day and under those driving conditions created a 'spectacle' that led some drivers to be distracted from the task of safely navigating" the highway) (emphases in original).[11] Whether that is so remains to be seen after Appellees have taken discovery. The district court did not err or commit an abuse of discretion in so concluding.

## C.

What we have said regarding the First Amendment claims largely disposes of the troopers' assertion that the district court erred in declining to address under Fed. R. Civ. P. 12(b)(6) the applicability of qualified immunity as to the Fourth Amendment unreasonable seizure claims. "This Court has held that the Fourth Amendment right to be arrested only on

---

[11] Of course, Appellees' First Amendment rights are not limitless. See <u>United States v. Grace</u>, 461 U.S. 171, 177-78 (1983) (quoting <u>Adderley v. Florida</u>, 385 U.S. 39, 47-48 (1966)) ("We have regularly rejected the assertion that people who wish 'to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.'").

probable cause is clearly established. See Smith v. Reddy, 101 F.3d 351, 356 (4th Cir. 1996)." Henderson v. Simms, 223 F.3d 267, 273 (4th Cir. 2000). To succeed on their Fourth Amendment claims, Appellees must establish that the troopers unlawfully arrested them. Id. An unlawful arrest is one effected in the absence of probable cause. See, e.g., Draper v. United States, 358 U.S. 307, 310-11 (1959).

As explained above, viewed in the light most favorable to Appellees, the allegations in the amended complaint plausibly alleged an absence of probable cause and that the absence of probable cause would have been clear to a reasonable law enforcement officer. Thus, the request for qualified immunity was properly denied on the face of the amended complaint.[12]

---

[12] The troopers contend that a reasonable officer confronted with the same situation as were they at the second demonstration would have believed that there was probable cause to arrest. The Eighth Circuit has decided a case with almost identical facts to the case at bar. The plaintiffs in Frye v. Kansas City Police Dep't, 375 F.3d 785 (8th Cir. 2004), were pro-life demonstrators who were arrested under a Kansas City ordinance that made it "unlawful for any person to . . . stand . . . either alone or in concert with others in a public place in such a manner so as to [o]bstruct any public street, public highway . . . by hindering or impeding the free and uninterrupted passage of vehicles, traffic, or pedestrians." Id. at 788. The court held that the arresting officers "reasonably interpreted the ordinance as prohibiting conduct which distracted drivers and thereby obstructed a public street by 'hindering or impeding the free and uninterrupted flow of traffic.'" Id. at 792. The court further held that the arresting officers were entitled to qualified immunity because (1) objectively, probable cause was at least arguable; (2)
(Continued)

22

VI.

For the reasons stated herein, the order of the district court denying qualified immunity is

AFFIRMED IN PART AND REVERSED IN PART.

---

consultation with a prosecutor prior to an arrest weighs heavily in favor of immunity; and (3) it is immaterial, for purposes of the qualified immunity analysis, whether it was the subjective intent of the arresting officer to suppress the arrestees' speech. Id. We do not speculate whether the outcome here will track the outcome in Frye; it suffices to observe that Frye was decided on motions for summary judgment after discovery, see 260 F.Supp.2d 796 (W.D. Mo. 2003), not on pre-discovery motions to dismiss.

23