In the
United States Court of Appeals
For the Seventh Circuit

No. 00-4270

EDWARD J. PASIEWICZ,

Plaintiff-Appellant,

v.

LAKE COUNTY FOREST PRESERVE DISTRICT;
RAY HENNING, individually and in his
official capacity as a Ranger/Police Officer for
the Lake County Forest Preserve District; KNUTE
SANDAHL, individually and in his official
capacity as a Ranger/Police Officer for the Lake County
Forest Preserve District; DEBRA PHILLIPS; and MICHELLE
PETERSON,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 4988--Matthew F. Kennelly, Judge.

Argued September 10, 2001--Decided November 2, 2001


  Before POSNER, KANNE, and EVANS, Circuit
Judges.

  EVANS, Circuit Judge.  Two women, while
out riding horses on a Sunday morning,
spotted a naked man cavorting in the
woods. Unfortunately for Edward
Pasiewicz, he was subsequently arrested
and charged with two misdemeanor counts
of "public indecency" under Illinois law
growing out of the incident. Fortunately
for Pasiewicz, he was acquitted after a
bench trial in state court on both
counts. After his acquittal, Pasiewicz
sued the officers who made the arrest,
the two women who said he was the
cavorter, and the Lake County Forest
Preserve District, the employer of the
arresting officers.

  Many of the "facts" supplied by the
parties on this appeal are irrelevant to
the issues before us. We will, however,
spend a few moments wading through the
details so the issue we will ultimately
consider can be put in better focus. We
start with the Sunday morning horseback
ride.

Two women, Michelle Peterson and Deborah Phillips, were riding horses in the forest preserve (Van Patten Woods in Lake County, Illinois) when they saw a naked man standing in the middle of their trail. This occurred around noon, and the women reported their observations to a forest preserve ranger/officer named Shannon a half an hour later. Both women said they saw the man for only a short time, but Phillips said she got a face-to-face view of the man before he slipped away into the bushes. Peterson added that the man appeared to be looking at a group of children playing in a clearing a short distance away. As with all descriptions, Phillips and Peterson did not agree on every detail, yet both essentially described a man around 6 feet tall, heavyset and bald, who appeared to weigh in the neighborhood of 240 pounds and who looked to be in his fifties.

The next day, Peterson dropped her daughter off at the Our Lady of Humility school where she was a kindergarten student. While walking back to her car (as later reported to the forest preserve police), she noticed a man sitting in a blue Taurus. In her mind, the man in the car was the man she had seen in the woods the day before.

The next day, Peterson said she saw the same man pull into the school parking lot. Peterson asked another woman who the man was and was told his name was Edward Pasiewicz and that he had children attending Our Lady of Humility. Peterson, indulging in a little detective work, ob tained Pasiewicz's address and telephone number from the school directory and, along with Phillips, went to the forest preserve police and gave the identifying information to two officers. The next day, Ray Henning, one of the preserve officer defendants in this suit, called the Pasiewicz home and left his pager number, with instructions for Pasiewicz to get in touch with him. Pasiewicz did so later that day, and Henning asked him to come to the Lake County Forest Preserve office that evening. Pasiewicz declined the invitation but, after confirming Henning's identity, contacted him the next day and said he would meet him at Waukegan East High School, where Pasiewicz worked in the maintenance department. The school was, of course, outside the physical boundaries of the

forest preserve.

Independent of Henning's line of inquiry, a supervising officer concluded that Pasiewicz should be arrested. The officer, Roy Johnson, spoke with the women, primarily Phillips, numerous times since the incident, and he also spoke with other officers regarding Shannon's initial report. Johnson instructed another officer, the second defendant Knute Sandahl, to arrest Pasiewicz. Henning and Sandahl went to the high school, and Pasiewicz escorted them to the athletic office. Although the officers apparently asked Pasiewicz whether he had been at the Our Lady of Humility school parking lot, and Pasiewicz said that he had, the officers did not specifically inquire into his whereabouts on August 30, the day Peterson and Phillips saw the nude man in the woods. Ten minutes into the meeting, Sandahl informed Pasiewicz that he was accused of public indecency and that he was under arrest. Pasiewicz called the accusation "unbelievable." The officers handcuffed Pasiewicz and took him to the Lake County jail for processing. In an hour or so he posted a $100 bond and was released from custody. As a result of the arrest, Pasiewicz was suspended from his job, his supervisor informing him that, given the charges, it was best that he not work around children.

After Pasiewicz's acquittal on the charges,/1 which came during a bench trial after the State rested its case, Pasiewicz filed this suit under 42 U.S.C. sec. 1983 alleging violations of the Fourth and Fourteenth Amendments. Another count in the complaint named the Lake County Forest Preserve District on a claim that it had failed to train and properly supervise its officers. A final count alleged a state law claim of defamation against Peterson and Phillips.

The district court, concluding on summary judgment that the defendant officers had probable cause for the arrest as a matter of law, dismissed the case against everyone except Phillips and Peterson. There being no federal claim against them, the court relinquished jurisdiction of the final count in the complaint to a state court forum.

Much is made, by Pasiewicz, of the

"fact" that he was an "innocent" man unjustly accused. In some ways that's un derstandable. The charges brought against him, although only misdemeanors, are serious and stigmatizing. Had he been charged with other misdemeanors--like unlawful possession of fireworks, battery, or negligent operation of a motor vehicle, to name a few--it is unlikely he would have been immediately suspended from his job as a school maintenance worker as soon as the charges were publicly leveled. But his actual (or just legal) "innocence" is not material to the issue we are considering. So his brief, where he proclaims his innocence and goes on and on for page after page about his whereabouts on the day the horseback riders saw the naked man, are beside the point.

One second-to-last word about "innocence." In wrapping up his brief, Pasiewicz writes that the district court (Judge Kennelly) "found that Pasiewicz was innocent of the crime for which he was arrested, and likewise found that Pasiewicz could have been spared his ordeal if the officers had undertaken any sort of investigation into the facts." While the second part of this sentence may be true, the first part isn't: Judge Kennelly did not find that Pasiewicz was innocent. That wasn't his job. A final determination-- whether a defendant is to be found guilty beyond a reasonable doubt in a court of law--rests with a trier of fact, and that was outside the scope of the proceedings before Judge Kennelly in the district court.

And now a last word about innocence. As we said, Pasiewicz was acquitted in state court after the prosecution presented its case against him. But as far as we can see, the accuracy of the "eyewitness identifications," which Pasiewicz lays out as his major beef against the arresting officers, appears to have played no role in that decision. As Pasiewicz himself alleges in his amended complaint, "the reason for the directed verdict was that the State had absolutely no evidence of lewd conduct on the part of the naked man witnessed by PETERSON and PHILLIPS in Van Patten Woods on August 30, 1998."

So finally, although Pasiewicz seems to have an airtight alibi--as disclosed by

depositions in this case--and might very well have won his acquittal on that basis in state court if the case went that far, it came to an early end on a failure of proof on the elements of the charge--not because the judge said Pasiewicz was not the man in the woods in his birthday suit on the day in question.

So we now come to our review of the grant of summary judgment. Our review is de novo. Silk v. City of Chicago, 194 F.3d 788, 798 (7th Cir. 1999). The rules governing motions for summary judgment, as set forth in Federal Rule of Civil Procedure 56(c), and as interpreted in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), and Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), are familiar, so we can skip that and get right to the point.

Pasiewicz brings claims against Henning and Sandahl for arresting him in violation of the Fourth Amendment (count I) and Fourteenth Amendment (count II). These two amendments share a common concern with protecting a person's physical liberty from government restraint. Because the Fourth Amendment's requirements are more specific, "a seizure that passes muster under the Fourth Amendment should also satisfy the requirements of the due process clause viewed as an independent source of constitutional norms." McKinney v. George, 726 F.2d 1183, 1187 (7th Cir. 1984). Collapsing the two inquiries is particularly appropriate here as the parties have briefed only the applicability of the Fourth Amendment.

Pasiewicz can find no quarter in the Fourth Amendment. When police officers obtain information from an eyewitness or victim establishing the elements of a crime, the information is almost always sufficient to provide probable cause for an arrest in the absence of evidence that the information, or the person providing it, is not credible. Sheik-Abdi v. McClellan, 37 F.3d 1240, 1247 (7th Cir. 1994); Hebron v. Touhy, 18 F.3d 421, 422-23 (7th Cir. 1994); Gramenos v. Jewel Cos., 797 F.2d 432, 438-41 (7th Cir. 1986). When probable cause has been gained from a reasonably credible victim or eyewitness, there is no constitutional duty to investigate further. Woods v. City of Chicago, 234 F.3d 979, 997 (7th

Cir. 2001); Sheik-Abdi, 37 F.3d at 1247 (noting that evidence of interviews and investigations is "not in any way a prerequisite to a finding of probable cause").

Sandahl and Henning had probable cause to arrest Pasiewicz. Peterson and Phillips both saw the naked man in broad daylight at a close distance. They gave similar, and fresh, descriptions of him to Shannon less than an hour later. After that, Peterson said she saw the same man in the days following the incident. Peterson provided Pasiewicz's name, address, and phone number based on information she obtained from someone who knew him, and from the school directory./2

Although Pasiewicz's appearance did not match exactly the characteristics provided by the two women, he bore a fair resemblance. It wasn't as if, given the description of a fairly good-size man, Pasiewicz looked like a guy who shopped at Napoleon's tailor. Moreover, any identification discrepancies were more than mitigated by the fact that Peterson believed she had seen the man again. In short, there was no indication that the women were lying, or that their information otherwise was not credible or accurate. Accordingly, the officers possessed probable cause. Woods, 234 F.3d at 996 (finding probable cause where the plaintiff provided no evidence that the description of the incident lacked accuracy or credibility).

Pasiewicz relies on BeVier v. Hucal, 806 F.2d 123 (7th Cir. 1986), arguing that BeVier requires police officers to conduct independent investigations before making an arrest. In BeVier, however, the arrestees were charged with child neglect, a crime requiring the accused to act "knowingly or wilfully." Id. at 126. Although an officer saw sunburnt, filthy, and listless children sitting in the sun on a hot day, he did not question the teenager watching the children or the parents themselves about the children's condition. Id. at 126-27. He simply arrested the father when he appeared as the children were being taken away and arrested the mother when she appeared at the police station. Id. at 125. We upheld a finding that the arrest was unreasonable, writing that "[r]easonable

avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place." Id. at 128.

Our case concerns a simpler issue: identity. Pasiewicz does not dispute (or at least does not seriously dispute) that the naked man, whoever he was, committed a crime of some sort in the Van Patten Woods. The question was whether Pasiewicz was the naked man. With regard to that issue, the officers had credible information to conclude that he was. Although the officers might have saved a law-abiding citizen considerable tumult by asking more questions or digging deeper into the case, the Fourth Amendment did not require them to do so.

Pasiewicz claims that officers need a greater quantum of evidence when making arrests for less serious crimes. Although this proposition is correct, see BeVier, 806 F.2d at 127 (noting that "probable cause is a function of information and exigency"), it does not give Pasiewicz much traction. Walking naked in the woods may be only a bit unsettling, but it is considerably more threatening when coupled with evidence, as in this case, that the walker was watching children play in a nearby clearing.

Pasiewicz argues that the officers should have obtained a warrant. He's right: They should have. The officers' conduct here was considerably less than perfect. There was no need to rush, and an arrest warrant could have, and would have, been obtained with ease. Fortunately for the officers, the Fourth Amendment demands reasonableness, notperfection, and the issue is not whether it would have been more prudent to secure a warrant. Instead, it's whether an arrest warrant, under these circumstances, was absolutely required. The answer is no. See Villanova v. Abrams, 972 F.2d 792, 795 (7th Cir. 1992).

And finally, the lack of an arrest warrant in this case is really a red herring. Suppose, at the meeting with Pasiewicz in the high school athletic office, the police had not arrested him but had instead given him a summons to appear in court the next week to formally plead to a public indecency charge that

would be filed that day. Would he not, except for being taken to the police station for an hour or so, have experienced all the same traumas? He still would have been publicly named as a person who was naked in the woods, he still would have probably been suspended from his job, he still would have had to get a lawyer, and he still would have had to sit in the dock during a public trial. Such is the misfortune of even an innocent person mistakenly identified as a culprit.

   Pasiewicz next argues that the officers acted unreasonably because they lacked jurisdiction. This argument has two premises: first, that the officers lacked the authority to make an extraterritorial arrest, and second, that their lack of jurisdiction renders their conduct unreasonable under the Fourth Amendment.

   With regard to the first premise, Pasiewicz claims that Illinois' Downstate Forest Preserve District Act, in particu lar the section authorizing forest preserve police forces, see 70 Ill. Comp. Stat. 805/8a, does not permit them to act on their own volition outside the district's physical boundaries. Rather, the officers may act only "in aid of the regular police force" of the extraterritorial jurisdiction and "subject to the direction" of its chief of police or other head. Id. Pasiewicz also claims that the statute giving law enforcement officers authority to arrest outside their jurisdiction, see 725 Ill. Comp. Stat. 5/107-4, does not apply to forest preserve officers because a forest preserve district is not included in the definition of "law enforcement agency," id. at 5/107(a)(4) (defining "law enforcement agency" to mean "a municipal police department or county sheriff's office of this State").

   We need not reach these statutory questions--indeed, we would be forced to do so without guiding state precedents--because even assuming that the officers violated a state statute by making an arrest outside their jurisdiction, it is clear that Pasiewicz's second premise is faulty. A violation of a state statute is not a per se violation of the federal Constitution. The federal government is not the enforcer of state law. Kraushaar v. Flanigan, 45 F.3d 1040, 1048 (7th Cir.

1995); Archie v. City of Racine, 847 F.2d 1211, 1217 (7th Cir. 1988) ("[T]o treat a violation of state law as a violation of the Constitution is to make the federal government the enforcer of state law."). We have applied this principle consistently in the context of state laws governing criminal process, see, e.g., Sheik-Abdi, 37 F.3d at 1249 (holding that a violation of a state statute regarding the swearing of criminal complaints does not give rise to constitutional liability); McKinney, 726 F.2d at 1188 ("If police officers have probable cause to make an arrest . . . it is immaterial to the constitutionality of their conduct that the arrest may have violated state law."), and see little reason to treat state laws governing police jurisdiction differently. It would not violate the Fourth Amendment for the Illinois Legislature to empower preserve officers to make arrests outside the district's physical boundaries. It is difficult to see why an officer engaging in the same underlying act necessarily would./3

   That said, an officer can act incorrectly with regard to his jurisdiction just as he can act incorrectly with regard to any other factor involved in the exercise of his authority. The present case might arguably be viewed differently if Sandahl and Henning knew they lacked jurisdiction and the Waukegan police department, where the arrest occurred, specifically prohibited the two officers from arresting Pasiewicz within their jurisdiction. Such a blatant disregard of state law and the chain of command could weigh on the scales of reasonableness. But those are not the present facts. Sandahl notified the Waukegan police department before the arrest. There is no evidence that the officers ignored an order of Waukegan officers not to arrest Pasiewicz. Accordingly, the officers did not act unreasonably under the Fourth Amendment, even assuming that they acted outside their jurisdiction.

   In sum, none of Pasiewicz's arguments show that Sandahl and Henning violated the Constitution when they arrested him. They and the other officers (Johnson in particular) certainly could have, and we think should have, proceeded with more caution. They get no commendation ribbons for the way they handled this case.

Pasiewicz's claim against the forest preserve district (even assuming it's a suable entity) for failure to train or supervise its officers properly regarding the laws of search, seizure, and jurisdiction is a born loser. Because the officers did not violate Pasiewicz's constitutional rights, he did not suffer constitutional injury. Accordingly, under City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (per curiam), the district cannot be held liable.

For the reasons stated, the judgment of the district court is AFFIRMED.

FOOTNOTES

/1 The parties do not tell us whether Pasiewicz's job suspension was lifted after his acquittal, but we would assume so.

/2 Pasiewicz claims that neither arresting officer had personal knowledge of the information providing probable cause. But both officers read Shannon's report. Sandahl was also present at the September 1 meeting when Peterson claimed that Pasiewicz was the man she had seen. Henning learned that the two women were close enough on August 30 to have clearly seen the suspect and that Peterson was "adamant" that the man she had seen in the parking lot was the "same gentleman" in the school parking lot the next day. Moreover, Johnson, who had ordered the arrest, had read Shannon's report and spoken with his officers and the women in the days following the incident. Even assuming that Sandahl or Henning knew nothing about the women's complaints, Johnson's and Shannon's knowledge would be imputed to them. United States v. Hensley, 469 U.S. 221, 232-33 (1985); United States v. Sawyer, 224 F.3d 675, 680 (7th Cir. 2000).

/3 Although courts have split on whether an arrest is per se unreasonable when an officer acts outside his or her jurisdiction, compare Abbott v. City of Crocker, 30 F.3d 994, 997-98 (8th Cir. 1994) (holding that an arrest made by an officer outside his jurisdiction does not violate the Fourth Amendment), and Madsen v. Park City, 6 F. Supp.2d 938, 945 (N.D. Ill. 1998) (finding no constitutional violation where officer lacked jurisdiction to stop plaintiff and issue a citation), with Ross v. Neff, 905 F.2d 1349, 1353-54 (10th Cir. 1990) (holding that an arrest made outside an officer's jurisdiction, absent exigent circumstances, violates the Fourth Amendment), and United States v. Foster, 566 F. Supp. 1403, 1412 (D.D.C. 1983) (holding that the "concept of reasonableness in the Fourth Amendment logically

presupposes an exercise of lawful authority by a police officer"), it is worth pointing out that Ross involved the ability of an Oklahoma state officer to arrest a Native American on tribal trust land. 905 F.2d at 1352. Under federal law, the state could assume criminal jurisdiction over the land only with congressional approval or tribal consent. Id. The present case concerns the jurisdiction of officers acting between political subdivisions of the same state.