**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 15-1768**

---

MARLOW HUMBERT,

Plaintiff – Appellant,

v.

MAYOR AND CITY COUNCIL OF BALTIMORE CITY; SHEILA DIXON, former Mayor of the City of Baltimore, in her individual capacity; BALTIMORE CITY POLICE DEPARTMENT; FREDERICK BEALEFELD, Police Commissioner Individually and as Police Commissioner, Baltimore City Police Department; MICHAEL BRASSELL, Police Officer Individually and as Police Officer, Baltimore City Police Department; CHRIS JONES, Detective Sergeant Individually and as Police Officer, Baltimore City Police Department; CAPRICE SMITH, Detective Individually and as Police Officer, Baltimore City Police Department; DOMINICK GRIFFIN, Detective Individually and as Police Officer, Baltimore City Police Department; JOHN AND JANE DOES 1-20, Individually and as currently unknown Police Officers, Baltimore City Police Department; RICHARD AND JANE ROES 1-20, Individually and as currently unknown Baltimore City Police Department Supervisors,

Defendants – Appellees,

and

MARTIN O'MALLEY, Individually and as Governor of the State of Maryland and former Mayor of the City of Baltimore; KEITH MERRYMAN, Detective Individually and as Police Officer, Baltimore City Police Department; CINESE CALDWELL, Laboratory Technician individually and as Police Officer, Baltimore City Police Department,

Defendants.

---

**No. 15-2461**

MARLOW HUMBERT,

        Plaintiff – Appellant,

     v.

BALTIMORE CITY POLICE DEPARTMENT; FREDERICK BEALEFELD, Police Commissioner Individually and as Police Commissioner, Baltimore City Police Department; SHEILA DIXON, former Mayor of the City of Baltimore, in her individual capacity; MAYOR AND CITY COUNCIL OF BALTIMORE CITY; CHRIS JONES, Detective Sergeant Individually and as Police Officer, Baltimore City Police Department; CAPRICE SMITH, Detective Individually and as Police Officer, Baltimore City Police Department; DOMINICK GRIFFIN, Detective Individually and as Police Officer, Baltimore City Police Department,

        Defendants – Appellees,

     and

MICHAEL BRASSELL, Police Officer Individually and as Police Officer, Baltimore City Police Department; CINESE CALDWELL, Laboratory Technician individually and as Police Officer, Baltimore City Police Department; JOHN AND JANE DOES, Individually and as currently unknown Police Officers, Baltimore City Police Department; KEITH MERRYMAN, Detective Individually and as Police Officer, Baltimore City Police Department; MARTIN O'MALLEY, Individually and as Governor of the State of Maryland and former Mayor of the City of Baltimore; RICHARD AND JANE ROES 1-20,

        Defendants.

Appeals from the United States District Court for the District of Maryland, at Baltimore. William D. Quarles, Jr., District Judge. (1:11-cv-00440-WDQ)

2

Argued: January 25, 2017                    Decided: August 7, 2017

Amended: August 22, 2017

———————————

Before GREGORY, Chief Judge, and THACKER and HARRIS, Circuit Judges.

———————————

Reversed in part, vacated in part, and remanded with instructions by published opinion. Chief Judge Gregory wrote the opinion, in which Judge Thacker and Judge Harris joined.

———————————

**ARGUED:** Charles Henry Edwards, IV, LAW OFFICE OF BARRY GLAZER, LLP, Baltimore, Maryland, for Appellant. Suzanne Sangree, BALTIMORE CITY DEPARTMENT OF LAW, Baltimore, Maryland, for Appellees. **ON BRIEF:** George Nilson, City Solicitor, Kara Lynch, Assistant Solicitor, Colin Glynn, Assistant Solicitor, BALTIMORE CITY DEPARTMENT OF LAW, Baltimore, Maryland, for Appellees.

———————————

GREGORY, Chief Judge:

For over a year, Appellant Marlow Humbert languished in pretrial solitary confinement, charged with committing a heinous act of sexual assault. The questionable investigatory strategies of Baltimore City Police Department ("BPD") officers led to Humbert's unlawful arrest. Afterwards, the officers failed to inform the State's Attorney that the victim could not positively identify Humbert and that DNA reports excluded him as a suspect. Once the prosecutor obtained this information, he dropped the charges and Humbert was finally freed. Humbert then initiated a suit against the officers who caused his arrest and the government officials he believed sanctioned the deprivation of his liberty.

A jury determined that the officers violated Humbert's constitutional rights and awarded him $2.3 million in compensatory and punitive damages. The district court, however, struck the damages award, concluding that the officers were entitled to qualified immunity because they had probable cause to arrest Humbert. On appeal, Humbert maintains that the district court erred in its probable cause analysis by misinterpreting the evidence and misapplying the law. As explained below, we reverse the district court's judgment and remand with instructions to reinstate the jury verdict.

I.

We begin with a summary of the relevant evidence presented at trial, viewed in the light most favorable to Humbert. *Buckley v. Mukasey*, 538 F.3d 306, 321 (4th Cir. 2008).

On April 29, 2008, a woman (the "victim") was raped in her home in the Charles Village neighborhood of Baltimore, Maryland. When Detective Dominic Griffin and Sergeant Chris Jones arrived at the scene, the victim described her attacker as a 5'7", African-American male in his late 30s to early 40s who was fairly well-spoken. The victim testified that Jones repeatedly asked whether the assailant was homeless, but Jones testified that he did not recall asking this question. Griffin then transported the victim to the hospital for a physical exam, during which her clothing was collected and physical evidence was retrieved from her body.

When she returned home, the victim, an experienced and well-trained artist, sketched the assailant attempting to capture his "very distinct features." J.A. 508. Her sketch was discarded, however, because BPD procedure required that an officer complete the composite sketch. The next day, the victim met with an officer to generate the composite, but it looked generic and she attempted to redraw portions of it. The victim testified that at some point either during or after completing the sketch, Jones showed her a photo on his cellphone of a man he identified as her attacker. Jones testified that he did not show "anybody a photo of anything," J.A. 622, but later stated that if he had shown her a photo, "it would have been to tell her what features to have drawn on the composite," J.A. 654. The officers created a "wanted" poster using the composite sketch and the victim's physical description of the assailant and disseminated it throughout the community and to every police district in the city. They then began to receive tips regarding people who resembled the sketch and description.

On May 5, 2008, Detective Caprice Smith showed the victim both a photo array of six individuals and a photobook with about forty-five black-and-white and color printouts of potential suspects, but the victim did not identify anyone. The victim informed Smith that the photos were of poor quality and distorted and that she could not identify a person of color using a black-and-white printout. On May 7, 2008—eight days after the attack— an officer stopped Humbert a couple of blocks from the victim's home and took a picture of him because he resembled the wanted poster. Humbert also informed the officer that he was homeless.

The following evening, Jones, Smith, and Griffin drove to the victim's home to show her another photobook, which included Humbert's picture. Upon seeing Humbert's photo—the second in the book—the victim became very emotional and started crying. She jabbed the photo, said "that's him," and attempted to push the photobook away. J.A. 470. The victim testified that Humbert had some facial features similar to her attacker, which triggered her emotional response, and Humbert's photo looked like the picture Jones showed her several days prior. The victim wrote "that's him" on the back of the photo and signed her name. She then informed Smith and Griffin that she could not positively identify Humbert as her assailant because she needed to see him in a physical lineup and hear his voice. The officers assured her that they were following BPD procedure and left her home.[1]

---

[1] The officers testified that BPD procedure did not permit the use of physical or voice lineups. There is, however, no evidence that this was ever communicated to the victim.

Six hours later, after making two attempts to locate Humbert at outdated addresses, the officers generated a second "wanted" flyer indicating that Humbert was wanted for rape and disseminated it to various BPD districts. Smith also applied for an arrest warrant stating that the victim positively identified Humbert as her attacker.[2] Finding probable cause to support the application, a court commissioner issued the arrest warrant. In the early morning of May 10, 2008, while Humbert was at work, an officer approached him with the wanted flyer and asked whether he was the man on the flyer. Humbert initially said yes, then saw the word "rape" and said, "that's not me." J.A. 570. The officer arrested Humbert and transported him to a police station. Humbert was later transferred to a single cell where he remained for nearly fifteen months.

Upon learning of Humbert's arrest, the victim contacted Jones to tell him that she could not positively identify Humbert as her attacker. When she went to Humbert's arraignment on June 23, 2008, she did not recognize Humbert. The victim again informed Jones that she was not positive whether Humbert was her attacker, but because Jones assured her that the officers had DNA evidence, she agreed to testify against him. The victim later met with Assistant State's Attorney Joakim Tan to discuss the case, and during her monthly conversations with Tan, she agreed to testify so long as there was DNA evidence.

---

[2] Smith, the officer who drafted the warrant application, testified that Griffin provided her with input for the application and Jones reviewed it before she submitted it to the court commissioner.

7

Throughout Humbert's extensive detention, the officers requested several DNA samples and received reports excluding him as the source of DNA found on the victim and her clothing. They received the first report on June 2, 2008, and the last report on December 15, 2008. Though the officers testified that prosecutors generally obtain DNA reports directly from the crime lab, they stated that if they had the reports, they should have given them to Tan. In fact, on May 12, 2008—two days after Humbert's arrest—Tan sent the officers a memorandum requesting that any and all information received by the BPD in connection with Humbert's case be immediately delivered to his office. On June 23, 2008, at Humbert's arraignment, Tan informed the court that he heard, but had not confirmed, that Humbert's DNA did not match any found on the victim. Tan declared that he needed the DNA reports for confirmation, but he did not receive them until May 11, 2009. Tan then informed the victim that there was no DNA evidence connecting Humbert to her attack, and he learned for the first time that the victim could not identify Humbert and she refused to testify. On July 30, 2009, Tan entered a *nolle prosequi* as to Humbert's charges, and Humbert was finally released about fifteen months after his arrest.

## II.

On February 17, 2011, Humbert initiated this action against officers Jones, Smith, and Griffin (hereinafter, the "Officers"), and several other state and local officials, alleging various violations of state law and the Fourth and Fourteenth Amendments to the

8

United States Constitution under 42 U.S.C. § 1983.[3] As relevant to this appeal, Humbert asserted against the Officers claims for malicious prosecution under § 1983 and for violations of Articles 24 and 26 of Maryland's Declaration of Rights. Humbert alleged, among other things, that the Officers improperly influenced the victim to identify him as her attacker and that they arrested him without probable cause by submitting a materially false arrest warrant application. Humbert further alleged that, after his arrest, the Officers obtained DNA reports excluding him as the attacker, but intentionally failed to furnish the reports to Tan or inform Tan of the victim's inability to positively identify him until the eve of his criminal trial.

After the district court denied the Officers' motion for summary judgment as to these claims, the parties proceeded to trial.[4] The jury returned verdict sheets with several factual findings.

The jury found that Humbert *had not* proven that:

A. …[A] reasonable officer, in [the Officers'] place, would not have believed that he closely matched the description of the attacker given by the victim.

B. …[A] reasonable officer, in [the Officers'] place, would not have believed that he closely resembled the composite sketch completed by the victim.

---

[3] Humbert also sued the Mayor and City Council of Baltimore City, BPD, former Police Commissioner Frederick H. Bealefeld, and former Mayor Sheila Dixon (collectively, the "Municipal Appellees"). The district court dismissed many of Humbert's claims, bifurcated this case, and stayed discovery as to the Municipal Appellees until the remaining claims against the Officers were resolved.

[4] The district court granted the motion in part as to other officers and granted summary judgment as to some of Humbert's claims not at issue in this appeal.

9

C. …[W]hen he was stopped by an officer he was not within blocks of the location where the victim's assault took place.

D. …[His last known] address given to the officer when he was stopped was less than two miles away from the location where he was stopped.

E. …[The Officers] reasonably believed that when [Humbert] was stopped by an officer he was not wearing a stocking cap made from a woman's stocking.

F. …[H]is record did not indicate that he was 5'7".

G. …[H]is record did not indicate that he weighed 180 pounds.

H. …[W]hen he was stopped by an officer he did not have a short haircut.

I. …[U]pon seeing his photo in the photo book, the victim did not have a strong emotional reaction.

J. …[U]pon seeing his photo in the photo book, the victim did not jab at the photo.

K. …[U]pon seeing his photo in the photo book, the victim did not say "that's him" without prompting.

L. …[U]pon seeing his photo in the photo book, the victim did not attempt to push it away from herself.

M. …[U]pon seeing his photo in the photo book, the victim did not sign her name above his picture.

N. …[U]pon seeing his photo in the photo book, the victim did not sign her name on the back of his picture.

O. …[U]pon seeing his photo in the photo book, the victim did not write "that's him" on the back of his picture.

P. …[T]he victim was threatened, promised something, or otherwise coerced into writing "that's him" on the back of his picture.

J.A. 210–13, 219–21, 227–29.

The jury further found that Humbert *had* proven that:

10

Q. …[T]he victim stated to [the Officers] before Mr. Humbert's arrest that she could not positively identify him as her attacker.

R. …[T]he victim told [the Officers] after Mr. Humbert was arrested that she could not positively identify him as her attacker.

J.A. 213, 221, 229.

Additionally, the jury found that a reasonable officer in the Officers' positions would not have believed that Humbert was responsible for the rape before issuing the arrest warrant. The jury ultimately determined that the Officers were liable for malicious prosecution under § 1983 and awarded Humbert $2.3 million in compensatory and punitive damages.[5] The district court, however, reserved for itself the legal question of whether the officers were otherwise entitled to qualified immunity.

After the trial, the Officers filed a motion for judgment as a matter of law or, in the alternative, for a new trial and remittitur. The district court concluded that the Officers had probable cause to arrest Humbert and were entitled to qualified immunity. The court thereby granted the motion, struck the jury award of damages, and found no need to address the motion for a new trial. Humbert timely appealed the court's disposition of his constitutional claims. The Municipal Appellees subsequently filed a motion for judgment as a matter of law, which the district court granted. The court concluded that because the Officers did not commit a constitutional violation, the § 1983 claims asserted against the

---

[5] The district court instructed the jury that its findings as to the federal claim would apply to the state constitutional claim. J.A. 215, 223, 231.

11

Municipal Appellees could not survive.[6] Humbert timely appealed this judgment, and we consolidated the appeals.

III.

We review de novo the district court's grant of a post-trial motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b). *Sloas v. CSX Transp., Inc.*, 616 F.3d 380, 392 (4th Cir. 2010). This Court views the evidence adduced at trial "in the light most favorable to [Humbert], the nonmoving party, and draw[s] all reasonable inferences in [his] favor." *Buckley*, 538 F.3d at 321. As to qualified immunity, we may reverse the district court only if "the evidence favoring the [plaintiff] is . . . legally sufficient to overcome the defense." *Durham v. Jones*, 737 F.3d 291, 298 (4th Cir. 2013) (quoting *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011)). We may not make credibility determinations or weigh the evidence, but we

> must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.

*Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000) (quoting 9A Wright & Miller, *Federal Practice and Procedure* § 2529, at 300 (2d ed. 1995)).

---

[6] The court also noted that only a negligent supervision claim remained against Bealefeld. After disposing of all the federal claims in the case, the court declined to exercise supplemental jurisdiction over this state law claim and dismissed it.

IV.

Humbert argues that the district court erred in determining that there was probable cause to support his seizure and that the Officers were entitled to qualified immunity. Qualified immunity shields government officials from liability in a § 1983 suit as long as their conduct has not violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether an officer is entitled to qualified immunity, the court must examine (1) whether the facts illustrate that the officer violated the plaintiff's constitutional right to be free from unreasonable seizures, and (2) whether the right was clearly established at the time of the alleged event such that "a reasonable officer would have understood that his conduct violated the asserted right." *Miller v. Prince George's County*, 475 F.3d 621, 627 (4th Cir. 2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001)). The answer to both questions must be in the affirmative to defeat the officer's entitlement to immunity. *Id.*

A.

First, viewing the evidence and the jury's factual findings in the light most favorable to Humbert, we must determine whether they demonstrate that the Officers' conduct amounted to malicious prosecution under § 1983. "[A]llegations that an arrest made pursuant to a warrant was not supported by probable cause, or claims seeking damages for the period after legal process issued"—e.g., post-indictment or arraignment—are considered a § 1983 malicious prosecution claim. *Brooks v. City of Winston-Salem*, 85 F.3d 178, 182 (4th Cir. 1996). Such a claim "is properly understood

13

as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort." *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (quoting *Lambert v. Williams*, 223 F.3d 257, 261 (4th Cir. 2000)). To succeed, a plaintiff must show that "the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in [the] plaintiff's favor." *Id.*

The jury found that the Officers caused Humbert to be seized and criminally prosecuted, *see* J.A. 214, 222, 230, and it is undisputed that the prosecutor entered a *nolle prosequi*. Our analysis will therefore focus on the existence of probable cause to institute and maintain the criminal proceedings against Humbert.

1.

Humbert contends that, though he was arrested pursuant to a warrant, his arrest was unsupported by probable cause because it resulted from a materially false warrant application. "'[P]robable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense." *Cahaly v. Larosa*, 796 F.3d 399, 407 (4th Cir. 2015) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). Probable cause is "an objective standard of probability that reasonable and prudent persons apply in everyday life," *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998), and determined by a "totality-of-the-circumstances" approach, *Illinois v. Gates*, 462 U.S. 213, 230 (1983). "While

14

probable cause requires more than bare suspicion, it requires less than that evidence necessary to convict." *Gray*, 137 F.3d at 769 (internal quotation marks omitted).

A party challenging the veracity of a warrant application must show that the officer(s) deliberately or with a "reckless disregard for the truth" made material false statements in the warrant application, *Franks v. Delaware*, 438 U.S. 154, 171 (1978), or omitted from that application "material facts with the intent to make, or with reckless disregard of whether they thereby made, the [application] misleading," *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990) (citation omitted). Reckless disregard can be evidenced by an officer acting "with a high degree of awareness of [a statement's] probable falsity," meaning that "when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Miller*, 475 F.3d at 627 (quoting *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000)). Omissions are made with reckless disregard when the evidence demonstrates that a police officer "failed to inform the judicial officer of facts [he] knew would negate probable cause." *Id.* (quoting *Beauchamp v. City of Noblesville, Inc.*, 320 F.3d 733, 743 (7th Cir. 2003)).

Moreover, a plaintiff must demonstrate that the false statement or omission is material, "that is, 'necessary to the [neutral and disinterested magistrate's] finding of probable cause.'" *Id.* at 628 (quoting *Franks*, 438 U.S. at 156). To determine materiality, the Court must "excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the corrected warrant affidavit would establish probable cause." *Id.* (quoting *Wilson*, 212 F.3d at 789).

15

Here, the warrant application included the victim's description of the assault and stated that:

> [a]n investigation was conducted, during which the victim completed a sketch of the suspect. It was disseminated throughout the community. Several leads were produced, one of which [led] to Marlow Humbert . . . . On May 8, 2008, his photograph was shown to the victim along with several other similar photographs, when the victim positively identified him as her attacker. Efforts were made to locate him with negative results.

J.A. 306. Humbert argues that (1) the statement that "the victim positively identified him as her attacker" is false and (2) a "corrected" warrant application excising the statement would not establish probable cause. The Officers contend that the statement is not false and a corrected warrant would merely amend the statement by adding the following: "but [the victim] stated that she felt she needed to see [Humbert] in person in a lineup and hear his voice." Appellees' Br. 29. The Officers explain that the victim's strong reaction to Humbert's photo and saying "that's him" constituted a positive identification, and that her subsequent reservations about his identity as her attacker did not diminish its veracity.

The jury's factual findings and the evidence adduced at trial clearly support Humbert's contention that the statement is false. Despite finding that the victim had a strong emotional reaction when she viewed Humbert's photo, said and wrote "that's him," and signed her name on his photo, the jury unequivocally found that the victim informed the Officers that she could not positively identify Humbert as her attacker. *See* J.A. 213, 221, 229. Additionally, trial testimony demonstrates that the victim reacted strongly to Humbert's photo and said "that's him" in part because Jones showed her a picture of man who "looked very much like" Humbert several days prior and plainly

16

stated that he was her attacker. J.A. 524. Though Jones testified to the contrary, the procedural posture of this case requires that we credit the victim's testimony in Humbert's favor and disregard Jones's contradicted testimony as the jury was not required to believe it. *See Reeves*, 530 U.S. at 301. Trial testimony also shows that Jones repeatedly asked the victim whether her attacker was homeless and that Humbert was homeless at the time he was stopped. Drawing all reasonable inferences in Humbert's favor, the evidence indicates that Jones may have shown the victim Humbert's photo because he presumed that Humbert was the assailant, and his actions affected her ability to identify Humbert as her attacker. And the victim's subsequent statements that she could not positively identify Humbert without seeing him in person and hearing his voice due to the poor quality of the photos in the photobook further belied the Officers' assertion that she positively identified Humbert. This evidence undoubtedly undercut the Officer's ability to rely on the victim's initial reaction to Humbert's photo as a positive identification.

Viewing the evidence in the light most favorable to Humbert, we therefore conclude that the statement that the victim positively identified Humbert as her attacker was false and the Officers had an obvious reason to doubt its accuracy before including it in the warrant application. As such, the inclusion of this false statement amounts to at least recklessness.

Regarding materiality, the parties dispute how the corrected warrant application should be composed. Humbert argues that the entire false statement should be removed, whereas the Officers assert that the statement should remain and we should also include

17

the victim's need to see Humbert in a lineup and hear his voice. Adopting the Officers' version of the corrected warrant would require that we base our probable cause determination on a plainly false statement and ignore Jones's suggestive conduct and the victim's inability to identify Humbert. Instead, we will excise the false statement that the victim positively identified Humbert and a corrected warrant would include: (1) a description of the assault, (2) that an investigation was conducted in which an officer showed Humbert's photo to the victim and identified him as the attacker, (3) that a composite sketch was drawn and distributed throughout the area, (4) that Humbert was one of several leads produced, (5) that the victim initially responded emotionally to Humbert's picture in a photobook and said "that's him," (6) that the victim then stated that she could not positively identify Humbert without seeing him in person and hearing his voice, and (7) that the Officers were unable to locate him.

Taking this information in the light most favorable to Humbert, the corrected warrant application would not have established probable cause to arrest Humbert. It is clear that the probable cause supporting the Officers' application was based primarily, if not entirely, on the false assertion that the victim positively identified Humbert. *See Torchinsky v. Siwinski*, 942 F.2d 257, 262 (4th Cir. 1991) ("It is surely reasonable for a police officer to base his belief in probable cause on a victim's reliable identification of his attacker."). The Officers contend that the victim's initial response to Humbert's photo in the photobook constitutes the identification. But had the application shown that Jones partially caused the victim's initial response by displaying Humbert's photo at the beginning of the investigation and identifying him as the attacker and shown that the

18

victim was ultimately unable to positively identify Humbert, that identification—the sole basis of probable cause—would have been negated. Thus the Officers' failure to mention these facts was reckless. Even more, the corrected warrant would have requested that the court commissioner issue a warrant for Humbert's arrest merely because he was one of several people who resembled a composite sketch, and in spite of Jones's suggestive conduct and the victim's inability to identify Humbert. Such a warrant would not have provided probable cause, "in light of all the evidence," to arrest Humbert. *Miller*, 475 F.3d at 629 (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1293 (10th Cir. 2004)).

The Officers unconvincingly assert that courts have found that resemblance to a physical description or composite sketch is enough to establish probable cause for an arrest. *See, e.g.*, *Chambers v. Maroney*, 399 U.S. 42, 46 (1975); *Pasiewicz v. Lake Cty. Forest Pres. Dist.*, 270 F.3d 520, 524 (7th Cir. 2001); *Shriner v. Wainwright*, 715 F.2d 1452, 1454 (11th Cir. 1983); *United States v. Diggs*, 522 F.2d 1310, 1314 (D.C. Cir. 1975). But the Officers ignore that, in those cases, the probable cause findings were based on much more than mere resemblance. For instance, in *Shriner v. Wainwright*, the Eleventh Circuit found that an officer had probable cause to stop and arrest Shriner for committing two robberies because he bore a "striking resemblance" to a physical description and composite sketches of the suspect provided by three witnesses, *and* because he was found a day after the crimes were committed in the same county. 715 F.2d at 1454. The court reasoned that, when combined "[w]ith such a temporal and geographic proximity, a description by witnesses of a suspect may provide a sufficient basis for arresting an individual who closely resembles the description." *Id.* Similarly, in

19

*Pasiewicz v. Lake County Forest Preserve District*, the Seventh Circuit found probable cause to arrest Pasiewicz for indecent exposure because he bore a "fair resemblance" to physical descriptions given by two witnesses, and because one witness saw Pasiewicz the day after the incident and identified him as the suspect. 270 F.3d at 524. The court reasoned that "there was no indication that the [witnesses] were lying, or that their information otherwise was not credible or accurate." *Id.* Contrary to the Officers' view, the courts considered the plaintiffs' resemblance to physical descriptions and sketches as they examined the totality of the circumstances presented.

The circumstances presented in the corrected application would not "warrant a prudent person, or one of reasonable caution, in the believing, in the circumstances shown," that Humbert attacked the victim. *Cahaly*, 796 F.3d at 407. While true that Humbert, as well as several others, resembled a composite sketch, the corrected application also demonstrates that the Officers improperly impacted the investigation and the victim's reaction to Humbert's photo in the photobook. The Officers fail to cite to any cases where the courts were confronted with such troubling evidence. The corrected application further shows that the victim informed the Officers that she could *not* identify Humbert as her attacker, in stark contrast to the witness in *Pasiewicz*. The corrected application does not include any additional information to overcome this evidence that so clearly undermines probable cause. No judicial officer employing the totality-of-the-circumstances approach would have issued the warrant simply because Humbert resembled a sketch.

Because the facts and circumstances presented by the corrected application are not sufficient in themselves to warrant a person of reasonable caution in the belief that Humbert committed the offense stated in the application, we conclude that the false statement and omitted facts are material. We are aware that "[a]n investigation need not be perfect, but an officer who intentionally or recklessly puts lies before a magistrate, or hides facts from him, violates the Constitution unless the untainted facts themselves provide probable cause." *Miller*, 475 F.3d at 630–31. Here, the untainted facts do not provide probable cause. Thus the warrant was invalid and could not support Humbert's seizure.

2.

We must next consider whether probable cause otherwise existed to arrest Humbert and initiate criminal proceedings against him. Despite our determination that the warrant was invalid, Humbert's seizure may nevertheless be justified if the arresting officer "had adequate knowledge independent of the warrant to constitute probable cause." *United States v. White*, 342 F.2d 379, 381 (4th Cir. 1965); *see Robinson v. City of South Charleston*, 662 F. App'x 216, 221 (4th Cir. Oct. 24, 2016) (unpublished) ("[P]robable cause is sufficient to justify a public arrest under the Fourth Amendment, regardless of the validity of the arrest warrants obtained by the officers or any deficiencies in the affidavits supporting them."). Because Humbert's malicious prosecution claim is based on the Fourth Amendment's right to be free from unreasonable seizure, our inquiry is not limited to the validity of the warrant application; Humbert must show that the *legal process* instituted against him was without probable

21

cause. *See Graves v. Mahoning County*, 821 F.3d 772, 775 (6th Cir. 2016) (stating that a plaintiff "may not prevail merely by showing that they were arrested with a defective warrant; they must show that they were *unreasonably seized*"); *see also Owens v. Balt. City State's Attorneys Office*, 767 F.3d 379, 390 (4th Cir. 2014) ("Malicious prosecution redresses injuries a plaintiff sustains as a result of a defendant's improper initiation or maintenance of formal proceedings against him.").

The district court concluded that the Officers had probable cause to arrest Humbert because the jury found that Humbert closely matched the victim's physical description of her assailant, he closely resembled the composite sketch, he was stopped by an officer "shortly" after the assault took place within blocks of the victim's home, and the victim "tentatively" identified him. J.A. 278. The district court, however, mischaracterized much of the jury's findings and the evidence adduced at trial.

Trial testimony indicates that Humbert closely matched a generic physical description—a 5'7", African-American male in his late 30s to early 40s who was fairly well-spoken—and a generic looking composite sketch of an African-American male. Humbert was also stopped *eight days* after the assault in the Charles Village neighborhood, near his homeless shelter and a couple of miles away from where his family members resided. These facts cannot reasonably support the probable cause needed for his arrest. *See Smith v. Munday*, 848 F.3d 248, 254 (4th Cir. 2017) (concluding that officer's knowledge that plaintiff "had previously been convicted for selling drugs . . . , that she was a black woman, and that she was 'near' the site of the drug sale because her home address was eleven miles away" was not enough to establish

22

probable cause to arrest her for possession and distribution of a controlled substance). Courts have typically found reasonable suspicion to stop or probable cause to arrest an individual who closely resembles a description or composite sketch when that resemblance is combined with *both* geographic and temporal proximity. *See, e.g.*, *Chambers*, 399 U.S. at 44 (finding probable cause to arrest suspects found *within an hour* of crime in vehicle matching a distinctive description about two miles from crime scene); *United States v. Quinn*, 812 F.3d 694, 698 (8th Cir. 2016) (finding that officer's location of suspect *within an hour* of crime and several blocks from crime scene, combined with matching a description, only supported a finding of reasonable suspicion); *United States v. Goodrich*, 450 F.3d 552, 562 (3d Cir. 2006) (finding reasonable suspicion to support stop of vehicle that matched a specific description and was found at the scene of a theft *in progress*); *Shriner*, 715 F.2d at 1454 (stating that resemblance to composite sketches and descriptions may provide probable cause for arrest of suspect when combined with finding him *one day* after two crimes were committed in the same county). These cases support a seizure occurring within only a few hours of the crime. Humbert's presence in Charles Village eight days later is not sufficiently proximate in time to warrant his arrest, as emphasized by the fact that he was not arrested based on his resemblance to the composite when initially stopped. If these facts could support probable cause, then officers would have probable cause to arrest "any local resident[] who fit the generic description of the day," so long as they were found walking in their own neighborhood more than a week after the commission of a crime. *Munday*, 848 F.3d at 254. "Such

23

scant evidence barely meets the threshold of 'mere suspicion,' let alone the threshold of probable cause." *Id.*

Moreover, the Officers can find no solace in the victim's so-called tentative identification, as the evidence demonstrates that the Officers improperly influenced the investigation from its inception. Jones asked the victim multiple times whether her assailant was homeless, and it is undisputed that Humbert was homeless at the time he was stopped. Jones also showed the victim Humbert's picture and identified him as her attacker a day after the assault occurred, either during or after she completed the composite sketch and only a few days before she saw his photo in the photobook. Again, drawing all reasonable inferences in Humbert's favor, the evidence indicates that Jones inappropriately affected the victim's ability to complete the composite sketch and identify her attacker. Such suggestive acts unquestionably nullified the Officers' ability to rely on the victim's initial reaction to Humbert's photo. And although the district court left these disturbing facts out of its probable cause inquiry, the jury credited this testimony when it found in favor of Humbert despite its numerous factual findings against him. Indeed, the jury awarded Humbert over $1 million in compensatory and punitive damages against Jones alone. Further, the victim's reaction was negated when she stated that she could not positively identify Humbert without seeing him in person and hearing his voice because of the poor quality of the photos in the photobook. The Officers make much of the victim's artistic background and that she saw her assailant's face moments before she was attacked, presumably to establish the victim's keen sense of

detail. Yet, even so, the victim explicitly and repeatedly informed the Officers that she could not identify Humbert as her attacker.

All of these facts taken together are not "sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown," that Humbert engaged in criminal activity. *Cahaly,* 796 F.3d at 407. Much like with the corrected warrant application, we simply cannot see how, under the circumstances of this case, the Officers could have reasonably concluded that they had probable cause to arrest Humbert. At most, the circumstances would have given the Officers only reasonable suspicion to investigate Humbert further. We therefore conclude that Humbert's arrest was not supported by probable cause.

Similarly, the legal process instituted against Humbert and his resulting pretrial detention were unsupported by probable cause. The evidence shows that the court commissioner made his probable cause determination by relying on a materially false and misleading warrant application. And during Humbert's fifteen-month detention, the Officers never obtained any evidence of his criminality before or after his arraignment. To the contrary, the victim continuously informed them that she could not identify Humbert. What is more, the Officers received reports excluding Humbert as a source of the DNA found on the victim and her clothing—the first report on June 2, 2008, and the last report on December 15, 2008. Yet, they did not give the reports to Assistant State's Attorney Tan until May 11, 2009, despite receiving a memorandum from Tan a year earlier on May 12, 2008, expressly demanding that any and all information received by the BPD in connection with the case be *immediately* delivered to his office. Drawing all

25

inferences in Humbert's favor, the Officers failed to promptly give the reports to Tan because the victim only agreed to testify against Humbert based on their assurances that DNA evidence supported Humbert's guilt. Further, they never notified Tan of the victim's inability to identify Humbert. It was only after Tan received the reports that he learned from the victim herself that she could not identify Humbert and she refused to testify. Because the Officers withheld such substantial information from Tan, he maintained the criminal proceedings against Humbert without any proper basis. To be sure, once Tan finally possessed this information, he entered a *nolle prosequi*. Viewing these facts in the light most favorable to Humbert, his criminal proceedings and pretrial detention also violated his Fourth Amendment rights. Put differently, the Officers caused legal process to be instituted and maintained against him without probable cause to believe that he committed a crime. *See Manuel v. City of Joliet*, ——U.S. ——, 137 S. Ct. 911, 918 (2017) (holding that pretrial detention resulting from legal process unsupported by probable cause violates the Fourth Amendment).

We therefore conclude that the evidence reasonably supports the jury's verdict in favor of Humbert's § 1983 malicious prosecution claim.[7]

---

[7] The standard used for analyzing Fourth Amendment claims is the same as that used for claims under Articles 24 and 26 of the Maryland Declaration of Rights. *See Henry v. Purnell*, 652 F.3d 524, 536 (4th Cir. 2011) (stating that the standards are the same); *see also Williams v. Prince George's County*, 685 A.2d 884, 895 (Md. Ct. Spec. App. 1996). As such, our probable cause determination applies to Humbert's state constitutional claims, for which the district court granted judgment in favor of the Officers. Thus our holding that the Officers violated Humbert's Fourth Amendment rights requires that we reverse the district court on this claim.

B.

Because we have determined that the Officers lacked probable cause to seize Humbert, we must next examine whether instituting criminal process against him violated a clearly established rule. The Officers argue that a reasonable person in the Officers' positions would not have known that his or her actions violated a clearly established right.

Certainly, the Fourth Amendment right to be seized only on probable cause was clearly established at the time of the events at issue here. *Brooks*, 85 F.3d at 183. The law made clear that arresting and initiating legal process against a person without probable cause amounts to a seizure in violation of the Fourth Amendment. *Lambert*, 223 F.3d at 261–62; *Brooks*, 85 F.3d at 183. Additionally, it was clearly established "that the Constitution did not permit a police officer deliberately, or with reckless disregard for the truth, to make material misrepresentations or omissions to seek a warrant that would otherwise be without probable cause." *Miller*, 475 F.3d at 631–32 (collecting cases). The objective standard for qualified immunity accommodates the allegation of falsity or material omissions "because a reasonable officer cannot believe a warrant is supported by probable cause if the magistrate is misled by [stated or omitted facts] that the officer knows or should know are false [or would negate probable cause]." *Smith v. Reddy*, 101 F.3d 351, 355 (4th Cir. 1996).

Though the law was clearly established, the Officers argue that they acted reasonably by relying on the victim's strong reaction to Humbert's photo and saying "that's him" to constitute a positive identification. For this proposition, the Officers cite

27

to *Reddy*, in which we noted that "[t]he reasonableness of [the officer's] conduct does not turn on whether probable cause was, in fact, present. When an officer acts pursuant to a warrant, the pertinent question is whether the officer could have reasonably thought there was probable cause to seek the warrant." *Id.* at 356. The plaintiff contended that it was unreasonable for the officer to seek the warrant because the officer should have doubted the reliability of the witnesses' statements. *Id.* The Court found that the officer acted reasonably because the witnesses' statements were consistent with other evidence implicating the plaintiff and confirmed by disinterested observers. *Id.*

Here, however, the Officers had no reasonable basis to believe probable cause existed to seek the warrant or initiate criminal proceedings against Humbert based on the victim's initial reaction to Humbert's photo. As stated above, the victim reacted emotionally to seeing Humbert's photo because his photo looked like the one Jones showed her the day after her attack and Jones indicated that he was her assailant. No reasonable officer could have believed that the Fourth Amendment permitted Jones's conduct. And any reasonable officer in the Officers' positions would have doubted the reliability of the victim's initial response to Humbert's photo and attributed it, at least in part, to Jones's actions. The Officers' irrational reliance is further underscored by the victim's subsequent statement that she could not positively identify Humbert. Under these circumstances, the Officers could not have reasonably believed that probable cause existed to seek a warrant for Humbert's arrest.

We therefore conclude that the Officers are not entitled to qualified immunity. Accordingly, we reverse the district court's qualified immunity determination and

28

remand to the district court with instructions to reinstate the jury's verdict as to this claim.

V.

Lastly, because the district court wrongly held that the Officers' conduct did not amount to a constitutional violation, the court never confronted whether the Municipal Appellees violated Humbert's Fourth Amendment rights. We therefore vacate the court's grant of judgment as a matter of law to the Municipal Appellees and remand for further proceedings consistent with this opinion.[8]

VI.

For the foregoing reasons, the district court's judgments are

*REVERSED IN PART, VACATED IN PART, AND REMANDED WITH INSTRUCTIONS.*

---

[8] Humbert also argues that the district court erred by failing to resolve the Officers' alternative motion for a new trial. The court however found no reason to address the motion because it entered judgment in the Officers' favor. We conclude that the district court did not abuse its discretion by essentially denying the motion as moot. *See Konkel v. Bob Evans Farms Inc.*, 165 F.3d 275, 279 (4th Cir. 1999) (stating that we review denial of motion for new trial under Rule 50(b) for abuse of discretion).